30 A.3d 1111

COMMONWEALTH of Pennsylvania, Appellee

v.

David CHMIEL, Appellant.

Supreme Court of Pennsylvania.

Submitted April 14, 2010.

Decided Nov. 9, 2011.

334

340

344

348

354

James H. Moreno, Defender Association of Philadelphia, Philadelphia, Maria Katherine Pulzetti, Federal Community Defender Office, Eastern District of PA, Tracy L. Ulstad, Defender Association of Philadelphia, for David Chmiel.

James Patrick Barker, Amy Zapp, PA Office of Attorney General, Harrisburg, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice McCAFFERY.

In this capital appeal, David Chmiel ("Appellant") challenges the dismissal, following a hearing, of his petition for collateral relief filed pursuant to the Post Conviction Relief Act ("PCRA").[1] After careful consideration of Appellant's

1. 42 Pa.C.S. §§ 9541–46.

arguments, we affirm the PCRA court's order dismissing his claims.

On September 6, 2002, following a three-week jury trial, Appellant was convicted of three counts of first-degree murder for the deaths of Angelina Lunario, James Lunario, and Victor Lunario. He was also convicted of two counts of robbery and one count of burglary. Following a penalty hearing, the jury sentenced Appellant to death. On December 29, 2005, this Court denied Appellant's direct appeal and affirmed the judgment of sentence. *Commonwealth v. Chmiel*, 585 Pa. 547, 889 A.2d 501 (2005) (*"Chmiel III"*).[2]

The facts underlying this case, and the evidence presented at the 2002 guilt and penalty phase proceedings, are fully detailed in *Chmiel III, supra*. For ease of reference for the various issues raised herein, we selectively summarize the factual and procedural history as follows.

On the morning of September 21, 1983, the Lunarios, three elderly siblings, were found stabbed to death in their Throop, Pennsylvania home. The medical examiner estimated that they had died between 11:00 p.m. on September 20, 1983, and 2:00 a.m. on September 21, 1983. Evidence and statements by neighbors led the police to question or suspect Appellant and/or his brother, Martin Chmiel. Police found at the scene of the murders a sweater sleeve, which the police were able to determine had been cut from a sweater owned by Martin. The sweater sleeve was used as a mask in the burglary of the Lunario home. The police also learned that Martin was aware that the Lunarios had kept large quantities of cash hidden away in numerous locations throughout the house.

Following the murders, Appellant was observed in the community uncharacteristically displaying large quantities of

---

**2.** The 2002 trial, conviction, and death sentence was Appellant's third such experience for the crimes charged against him. Twice previously, following Appellant's conviction and sentence of death for the murders of the Lunarios, this Court had awarded Appellant a new trial on the issue of Appellant's guilt. *See Commonwealth v. Chmiel*, 536 Pa. 244, 639 A.2d 9 (1994) (*"Chmiel I"*) (granting Appellant's direct appeal); and *Commonwealth v. Chmiel*, 558 Pa. 478, 738 A.2d 406 (1999) (*"Chmiel II"*) (granting Appellant's direct appeal).

cash. Appellant was known to be in need of money to pay lawyers who were defending him against criminal charges of rape, involuntary deviate sexual intercourse, indecent and aggravated assault, terroristic threats, and recklessly endangering another person. During a subsequent search of Appellant's house, the police discovered $2400 in $50 and $100 bills on top of a hutch.

When police questioned Martin, based on the discovery at the murder site of the sleeve cut from his sweater, he admitted that he and Appellant had planned to rob the Lunarios to acquire the money needed for Appellant's legal bills, but that Martin had backed out of the scheme. Martin informed the police that after news of the murders had become public, Appellant told him that he had committed the murders, providing details of the crime. Police determined that these details, as relayed to them by Martin, could only be known by the murderer, as none had been publicly released. However, Martin was able to show that at the time the Lunarios were murdered, he was participating with his brother-in-law, Thomas Buffton, in a "fire watch." Although Buffton had been a co-conspirator with Martin in previous unrelated criminal activity, Martin's arrival at the fire watch, if not his continued presence there, was vouched for by two other witnesses, including the Scranton Fire Chief.

In light of Martin's alibi, the police directed their attention to Appellant. Following Appellant's arrest, a Pennsylvania State Police forensic scientist conducted a microscopic analysis of six hairs retrieved from the sweater sleeve found at the murder scene. When the forensic scientist compared two of those hair strands microscopically with hair strands obtained from Appellant, both sets of hair strands contained identical features. The forensic scientist concluded that the two hair strands found on the sweater sleeve mask were microscopically **similar** to Appellant's hair, but not to Martin's or the Lunarios' hair. (Later, in 2000 or 2001, mitochondrial DNA testing revealed that Appellant fell within one of the mitochon-

drial DNA profiles retrieved from two of the hairs found on the sweater sleeve.) [3]

Appellant testified at his trial, denying any involvement with the murders and robbery of the Lunarios. He asserted that his prosecution for those crimes was the result of a conspiracy involving the police; his brother, Martin; Buffton; and others. In an alibi different from that he had asserted at an earlier trial, Appellant testified that he had been at the home of Patrick Battle from 11:00 p.m. on Tuesday, September 20, 1983, to 1:30 a.m. Wednesday morning on September 21, 1983, to watch the double-header baseball games between the Baltimore Orioles and the Detroit Tigers. Appellant further testified that after the baseball games, he drove to Martin's residence, arriving by 1:45 a.m.

However, Appellant's testimony was not consistent with other evidence produced at trial. Battle testified that the double-header had been on Wednesday night, almost twenty-four hours after the murders. Martin's wife, Mary, testified that Appellant had arrived at their home at 3:45 a.m. on September 21, 1983. Another witness, Daniel McGlynn, testified that at 4:00 a.m. he observed Appellant in a restaurant located one mile from the Lunarios' home. Moreover, Appellant's car was observed near the Lunarios' home at the time of the murders.

Following Appellant's conviction, the matter proceeded to the penalty phase where Appellant gave evidence regarding the following mitigating factors: (1) his lack of a significant history of prior criminal convictions, 42 Pa.C.S. § 9711(e)(1); (2) his lack of capacity to appreciate his conduct or to conform his conduct to the requirements of law due to substantial impairment by alcohol, 42 Pa.C.S. § 9711(e)(3); and (3) his character and background and the circumstances of his offense, 42 Pa.C.S. § 9711(e)(8). Appellant sought to prove the

3. As we explained in *Chmiel III*, "[h]umans have both nuclear DNA and mitochondrial DNA. Mitochondrial DNA is found outside of the cell nucleus, in the mitochondria, ... and is inherited only from one's mother (distinguishable from DNA forming the nucleus of each cell, which is inherited from both parents)." *Id.* at 513 n. 9 (citations to the trial record omitted).

(e)(8) mitigating factors with evidence of his (a) family relationships; (b) abusive upbringing; (c) religious practice; (d) military service; (e) prison record; and (f) relationship with his daughter.

On September 10, 2002, the jury returned a death penalty verdict, finding two aggravating and two mitigating circumstances. The aggravating circumstances found by the jury were: (1) the commission of a murder in the perpetration of a robbery or burglary, 42 Pa.C.S. § 9711(d)(6); and (2) multiple murder convictions for the murders of the Lunarios, 42 Pa. C.S. § 9711(d)(11). The mitigating circumstances found by the jury were: (1) Appellant did not have a significant history of prior criminal convictions, including felony convictions involving the use or threat of violence to another person, 42 Pa.C.S. § 9711(e)(1); and (2) Appellant proved "other evidence of mitigation" caused by his family relationships and abusive upbringing, 42 Pa.C.S. § 9711(e)(8). The jury found that the aggravating circumstances outweighed the mitigating circumstances.

Following Appellant's conviction and sentence, his trial counsel, Paul A. Ackourey, Esq., and Gerard E. Grealish, Esq., withdrew their representation of Appellant. Robert M. Buttner, Esq., and James Elliott, Esq., were appointed as substitute counsel. Substitute counsel filed an amended post-sentence motion asserting forty alleged errors and eight claims of ineffectiveness of trial counsel. Following the denial of post-sentence motions, this Court affirmed Appellant's sentence on direct appeal in *Chmiel III*, disposing of numerous challenges to the guilt and penalty phase proceedings, including several claims of ineffective assistance of counsel.[4] On

---

4. At the time he filed his post-sentence motions, Appellant was required to raise claims of ineffectiveness of trial counsel at the first stage in the proceedings at which he was represented by different counsel, as his post-sentence motions were filed prior to this Court's decision in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), which signaled a change in the law regarding the litigation of ineffectiveness claims. Thus, Appellant's post-sentence motions raising ineffectiveness claims were properly raised, they had been fully litigated in the trial court, and this Court determined that it was appropriate to address those claims on direct appeal pursuant to our analysis in *Common-*

October 2, 2006, the United States Supreme Court denied Appellant's subsequent petition for writ of *certiorari. Chmiel v. Pennsylvania*, 549 U.S. 848, 127 S.Ct. 101, 166 L.Ed.2d 82 (2006).

Appellant filed a timely *pro se* petition pursuant to the PCRA on March 21, 2007, and the court appointed the Defender Association of Philadelphia, Capital Habeas Unit, to represent him. On June 30, 2008, Appellant filed a counseled amended PCRA petition, and thereafter, pursuant to a partial grant of a motion to supplement, Appellant filed a supplement to his amended PCRA petition, raising two additional claims. The PCRA court conducted hearings on the claims over an extended period: August 8 and 11–13, 2008; December 15–16, 2008, and February 3, 2009. The PCRA court denied Appellant's request for PCRA relief in a detailed and extensive memorandum opinion and order filed on March 2, 2009. This appeal followed, wherein Appellant states twelve issues for review.[5]

*wealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 839, 853–54 (2003). *Commonwealth v. Chmiel*, 585 Pa. 547, 889 A.2d 501, 540 (2005) (*"Chmiel III "*).

5. Appellant's claims are reproduced verbatim below, but reordered for ease of disposition:
 1. Are Appellant's claims cognizable under the PCRA and not previously litigated or waived?
 2. Did the Commonwealth violate the dictates of *Brady, Strong, Banks* and *Napue* by failing to disclose, prior to trial, the consideration received by Thomas Buffton and Martin Chmiel in return for their testimony against Appellant?
 3. Did trial counsel render ineffective assistance by failing to investigate and present witnesses to challenge the identification of Appellant's car?
 4. Is Appellant entitled to relief from his conviction because of numerous errors relating to the Commonwealth's introduction of inadmissible, unreliable hair comparison evidence[;] and was defense counsel ineffective for failing to seek exclusion of this evidence, rebut any inference of guilt arising from the evidence, or object to the prosecutor's misrepresentation to the jury concerning the evidence?
 5. Were trial and appellate counsel ineffective for failing to properly raise and preserve the following issues: a) trial court error for allowing the Commonwealth to cross-examine Appellant with information derived from Attorney Kennedy's testimony at a prior PCRA hearing[;] b) trial court error for allowing the Commonwealth to utilize Appellant's post-arrest statement; c) trial counsel ineffective-

 Under our standard of review for an appeal from the denial of PCRA relief, we must determine whether the ruling of the PCRA court is supported by the record and is free of legal error. *Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586, 593 (2007). The PCRA court's credibility determinations are binding on this Court when they are supported by the record. *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 532, 539 (2009). However, this Court applies a *de novo* standard of review to the PCRA court's legal conclusions. *Commonwealth v. Rios*, 591 Pa. 583, 920 A.2d 790, 810 (2007).

ness for failing to object promptly and request a curative instruction and mistrial in response to the Commonwealth's improper and prejudicial questioning of Julie Maconeghy[;] and d) trial court error in denying a motion for change of venire and venue and appellate counsel's ineffectiveness for failing to raise this issue?

6. Is Appellant entitled to relief from his conviction because of numerous errors relating to the Commonwealth's introduction of inadmissible, unreliable mitochondrial DNA evidence[;] and was defense counsel ineffective for failing to seek exclusion of this evidence, rebut an inference of guilt arising from the evidence[,] and object to the prosecutor's misrepresentation to the jury concerning this evidence?

7. Did trial counsel render ineffective assistance by failing to adequately investigate and prepare for Appellant's capital sentencing hearing?

8. Did the trial court's denial of individual *voir dire* of potential jurors violate appellant's rights under the U.S. Constitution, Pennsylvania law[,] and due process, and were all prior counsel ineffective to the extent they failed to object, raise, and litigate this meritorious issue?

9. Did the Commonwealth's presentation of inflammatory, prejudicial testimony from Assistant District Attorney Fisher[ ] violate Appellant's Eighth Amendment Right to a reliable capital sentencing proceeding[,] and were prior counsel ineffective for failing to raise and litigate this issue?

10. Did the prosecutor's misconduct at the penalty phase violate Appellant's Sixth, Eighth, and Fourteenth Amendment rights and his rights under Article I, Sections 1, 6, 9, 13, 14[,] and 25 of the Pennsylvania Constitution?

11. Was trial counsel ineffective for failing to present Robert Chmiel as a mitigation witness[,] failing to request that counsel be appointed to represent him regarding the perjury threat, and failing to inform the Court that a threat was having a chilling effect upon the witness?

12. Is Appellant entitled to relief from his convictions and death sentence as a result of the cumulative impact of the errors described herein?

To be eligible for PCRA relief, a petitioner must plead and prove by a preponderance of the evidence that his or her conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S. § 9543(a)(2). These circumstances include a violation of the Pennsylvania or United States Constitution and ineffective assistance of counsel which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(i), (ii). Furthermore, a petitioner must establish that the claims of error raised in the PCRA petition have not been previously litigated or waived, and that "the failure to litigate the issue prior to or during trial, during unitary review or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel." 42 Pa.C.S. § 9543(a)(3) and (4); *Washington, supra* at 593. An issue has been waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state post[-]conviction proceeding." 42 Pa.C.S. § 9544(b). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2).

▮▮▮ To prevail on a claim of ineffective assistance of counsel, a petitioner must overcome the presumption that counsel is effective by establishing all of the following three elements, as set forth in *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975–76 (1987): (1) the underlying legal claim has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) the petitioner suffered prejudice because of counsel's ineffectiveness. *Commonwealth v. Dennis*, 597 Pa. 159, 950 A.2d 945, 954 (2008). With regard to the second, reasonable basis prong, "we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis." *Washington, supra* at 594. We will conclude that counsel's chosen strategy lacked a reasonable basis only if Appellant proves that "an alternative not chosen offered a potential for success substan-

tially greater than the course actually pursued." *Commonwealth v. Williams*, 587 Pa. 304, 899 A.2d 1060, 1064 (2006) (citation omitted). To establish the third, prejudice prong, the petitioner must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's ineffectiveness. *Dennis, supra* at 954. "We stress that boilerplate allegations and bald assertions of no reasonable basis and/or ensuing prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective." *Commonwealth v. Paddy*, 15 A.3d 431, 443 (Pa.2011).

As noted above, Appellant's trial and the filing of his post-sentence motions pre-dated this Court's holding in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726, 738 (2002), in which we held that all claims of trial counsel ineffectiveness should be raised at the PCRA stage rather than on direct appeal.[6] In post-sentence motions and on direct appeal while represented by counsel different from counsel representing him at trial, Appellant raised numerous ineffectiveness claims against trial counsel that were fully litigated by the trial court. Because this circumstance constituted an exception to the *Grant* rule, we reviewed and disposed of Appellant's raised ineffective assistance of trial counsel claims on direct appeal. *See supra* n. 5; *Chmiel III, supra* at 540–47. Any other claim of trial counsel ineffectiveness that Appellant failed to raise on direct appeal has been waived. *See Commonwealth v. Tedford*, 598 Pa. 639, 960 A.2d 1, 13 (2008); *Washington, supra* at 594 (citing 42 Pa.C.S. § 9544(b)).

However, any claims of ineffectiveness of trial counsel not previously raised, and thus waived, may be framed as "layered claims" under *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014, 1023 (2003). We have explained:

[T]o be eligible for relief on these . . . claims, appellant must plead and prove that: (1) trial counsel was ineffective for a certain action or failure to act; and (2) direct appeal counsel was ineffective for failing to raise trial counsel's ineffective-

6. Prior to *Grant*, claims of trial counsel ineffectiveness were waived if not raised by new counsel on appeal. *See Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977).

ness. As to each relevant layer of representation, appellant must meet all three prongs of the *Pierce* test for ineffectiveness. A failure to satisfy any of the three prongs of the *Pierce* test requires rejection of a claim of ineffective assistance of trial counsel, which, in turn, requires rejection of a layered claim of ineffective assistance of direct appeal counsel.

*Commonwealth v. Ly,* 602 Pa. 268, 980 A.2d 61, 74 (2009) (quoting *Commonwealth v. Collins,* 598 Pa. 397, 957 A.2d 237, 244–245 (2008)) (citations and footnotes omitted).

■ Thus, if the petitioner cannot prove the underlying claim of trial counsel ineffectiveness, then petitioner's derivative claim of appellate counsel ineffectiveness of necessity must fail, and it is not necessary for the court to address the other two prongs of the *Pierce* test as applied to appellate counsel. *Rios, supra* at 800; *Commonwealth v. Carson,* 590 Pa. 501, 913 A.2d 220, 233 (2006).

■ It is important to recognize that a claim of appellate counsel ineffectiveness for failing to raise a claim of trial counsel ineffectiveness is distinct from a claim of appellate counsel ineffectiveness grounded in the manner in which appellate counsel litigated a claim of trial counsel ineffectiveness on appeal. *See Tedford, supra* at 16. In the former case, the claim of trial counsel ineffectiveness has been waived, but in the latter case, the claim of trial counsel ineffectiveness claims has been previously litigated.

[This] distinction [between previously litigated and waived claims of trial counsel ineffectiveness] is important because, if a trial counsel ineffectiveness claim was already litigated, appellant must show that appellate counsel was ineffective in the manner in which he litigated the claim; and if the claim was waived, on the other hand, appellant must demonstrate that appellate counsel was ineffective for failing to raise the claim on direct appeal.

*Tedford, supra* at 16.

We now address Appellant's claims as he has specifically worded them.

1. **Are Appellant's claims cognizable under the PCRA and not previously litigated or waived?**

Appellant asserts that his claims were neither previously litigated nor waived. Rather than making a determination of this pervading issue at this stage, we shall address Appellant's assertion as required during our review of his substantive arguments and sub-arguments. We note, however, that all of Appellant's claims of trial counsel ineffectiveness, if not previously litigated, are waived for Appellant having failed to raise them on direct appeal. However, Appellant has presented layered ineffectiveness claims, asserting in each case that appellate counsel was ineffective for having failed to raise the relevant issues of trial counsel ineffectiveness. We now turn to Appellant's substantive arguments, which we have rearranged and divided into guilt and penalty phase claims.

## GUILT PHASE CLAIMS

2. **Did the Commonwealth violate the dictates of *Brady, Strong, Banks,* and *Napue* by failing to disclose, prior to trial, the consideration received by Thomas Buffton and Martin Chmiel in return for their testimony against Appellant?**

In this issue, Appellant alleges that the Commonwealth failed to disclose evidence favorable to him in violation of his constitutional right to due process as recognized in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Under *Brady* and the decisional law it has spawned, some of which Appellant references in his statement of this issue,[7] a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature. *Commonwealth v. Lesko*, 15 A.3d 345, 370 (Pa.2011). Appellant contends that the prosecutor here withheld specific informa-

---

7. *See Commonwealth v. Strong*, 563 Pa. 455, 761 A.2d 1167 (2000), and *Banks v. Dretke*, 540 U.S. 668, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004). Appellant cites *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), for the proposition that a prosecutor has a duty to correct false testimony, whether or not the prosecutor solicited such testimony.

tion of deals or "understandings" between the prosecutor and material Commonwealth witnesses, Martin Chmiel and Thomas Buffton, and the Commonwealth attorneys failed in their duty to admit to the jury the existence of such deals or understandings when these witnesses denied their existence during their trial testimony.

Appellant provides no indication as to when or how he became aware of the alleged *Brady* material, all of which would appear to have been available at the time of his trial (his third) or on direct appeal. Accordingly, Appellant's *Brady* claims are waived for failure to raise them in an earlier proceeding. *See Commonwealth v. Pursell,* 555 Pa. 233, 724 A.2d 293, 306 (1999) (citing 42 Pa.C.S. § 9544(b)); *see also Commonwealth v. Morris,* 573 Pa. 157, 822 A.2d 684, 696 (2003) (rejecting a *Brady* claim where the appellant did not make clear that the information was not available at trial or that counsel could not have uncovered it with reasonable diligence).

However, Appellant asserts an ineffective assistance of trial and appellate counsel claim regarding their individual failures to pursue this issue. Thus, we review these claims solely through the prism of ineffectiveness of counsel. After so doing, we conclude that Appellant's claims of ineffective assistance of counsel are meritless, as discussed below.

■ To establish a *Brady* violation, an accused must prove three elements:

■ the evidence [at issue] was favorable to the accused, either because it is exculpatory or because it impeaches; [2] the evidence was suppressed by the prosecution, either willfully or inadvertently; and [3] prejudice ensued.

*Paddy,* 15 A.3d at 450 (quoting *Commonwealth v. Lambert,* 584 Pa. 461, 884 A.2d 848, 854 (2005))..

■ The burden rests with Appellant to "prove, by reference to the record, that evidence was withheld or suppressed by the prosecution." *Commonwealth v. Porter,* 556 Pa. 301, 728 A.2d 890, 898 (1999) (citations omitted). There is no *Brady* violation when the appellant knew or, with reason-

able diligence, could have uncovered the evidence in question, or when the evidence was available to the defense from nongovernmental sources. *Paddy, supra* at 451.

Moreover, as we have observed:

The evidence alleged to have been withheld by the prosecution must have been **material** evidence that deprived the defendant of a fair trial. Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 450 (emphasis in original; citations and quotation marks omitted).

Further:

In determining whether a reasonable probability of a different outcome has been demonstrated, the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is shown when the government's suppression of evidence undermines confidence in the outcome of the trial. The United States Supreme Court has made clear that [the] materiality standard is not a sufficiency of the evidence test. A *Brady* violation is established by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Importantly, the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense. In order to be entitled to a new trial for failure to disclose evidence affecting a witness's credibility, the defendant must demonstrate that the reliability of

the witness may well be determinative of his guilt or innocence.

*Commonwealth v. Weiss,* 604 Pa. 573, 986 A.2d 808, 815 (2009) (citations and quotation marks omitted).

We also recognize that due process requires the jury to be informed of any promise or understanding that the government would extend leniency in exchange for a witness's testimony. *Commonwealth v. Strong,* 563 Pa. 455, 761 A.2d 1167, 1172 (2000). Importantly, the understanding between the prosecution and its testifying witness need not be in the form of a signed contract or a completed, ironclad agreement in order to qualify as *Brady* material. *Id.* at 1171–72, 1174. "Impeachment evidence which goes to the credibility of a primary witness against the accused is critical evidence and it is material to the case whether that evidence is merely a promise or an understanding between the prosecution and the witness." *Id.* at 1175. However, mere conjecture as to an understanding is not sufficient to establish a *Brady* violation. *Commonwealth v. Champney,* 574 Pa. 435, 832 A.2d 403, 412 (2003).

Here, Appellant's *Brady* claim is based on the following evidence adduced at trial and at the PCRA hearing. Martin Chmiel, his brother-in-law Thomas Buffton, and Appellant's and Martin's sister, Nancy, who was then married to Thomas, conspired to burn the Buffton house in order to obtain insurance proceeds. Martin did start a fire at the house, and the Bufftons did receive insurance proceeds for fire damage. The Bufftons then hired Appellant to repair the damage who, in turn, hired Martin to assist. This occurred shortly before the murders of the Lunarios. Appellant and Martin were still working on the house repairs when the murders occurred. Martin and Buffton were later arrested, pled guilty, and sentenced for their arson-related crimes. Nancy was not arrested or prosecuted.

Martin and Buffton testified for the Commonwealth at all three of Appellant's trials. Martin testified regarding Appellant's confession to him that he had committed the murders.

Buffton provided an alibi for Martin during the time of the murders. At his third, 2002 trial, Appellant testified that he did not commit the murders, pursuing a trial strategy that attempted to direct suspicion toward Martin, and possibly Buffton as well.

During their 2002 trial testimony, both Martin and Buffton admitted that they had been convicted of crimes arising from the arson and that they had served prison sentences for these crimes. On cross-examination, Appellant's counsel elicited testimony from Martin that he had been sentenced to one to two years' imprisonment, but had served only nine weeks in the county jail and six weeks in a halfway house, with two years' probation following. Further, the jury heard from Martin that his minimum sentence had been reduced to six months and that he was furloughed from a work-release program so that he could eat dinners at home. Martin admitted to cooperating with the police in the prosecution of Appellant; however, he denied that his testimony was given as part of a deal with the Commonwealth. *See* Notes of Testimony ("N.T.") Trial, 8/26/02, at 41–43, 73–76.

Buffton testified at the 2002 trial that he had been sentenced to one to three years' imprisonment for his part in the arson scheme. He further testified that at his resentencing hearing, an assistant district attorney appeared on his behalf, although he denied that this individual requested a reduction in sentence. However, Buffton's sentence was modified to sixty days' imprisonment in county jail, ten months of work release, and two years of probation. He never paid restitution for the insurance fraud. Buffton also denied that his trial testimony was part of a deal, testifying that the Commonwealth "offered nothing" and made no promises to him. N.T. Trial, 8/28/02, at 51–52, 93–98, 106–07. Both Martin and Buffton were resentenced on August 1, 1984. N.T. PCRA Hearing, 8/12/08, at 73; N.T. Trial, 8/28/02, at 106.

During closing argument, Appellant's trial counsel urged the jury to disregard the testimony of Martin and Buffton based, in significant part, on the leniency on the arson sentences given them by the Commonwealth in what he alleged

was an exchange for their trial testimony. Appellant's counsel emphasized the brief jail time served by these witnesses and the fact that, while under their lenient sentences, they had been very quickly transferred to work release and enjoyed a significant number of weekend furloughs. N.T. Trial, 9/6/02, at 47–48. Counsel used the term "favoritism," and in commenting that neither had provided restitution to the insurance company that they had defrauded, stated to the jury: "What a deal." *Id.*

At the PCRA hearing, Bufftton and Nancy testified on behalf of Appellant. Martin did not testify. Bufftton testified that prior to Appellant's first trial in 1984, he had met with Assistant District Attorney Ernest Preate and two state troopers. He testified that these individuals had told him that, while they could not promise him anything and they were not offering a "deal," if Bufftton testified for the Commonwealth at Appellant's trial and pled guilty to the arson charges against him, they would not prosecute his wife, Nancy, for the arson, and would help him expunge his record at a future date. N.T. PCRA Hearing, 12/15/08, at 57–58. In response to a question regarding the importance of his testimony to the prosecution, Bufftton answered: "I mean, I would have testified anyway that Marty wasn't there between those hours but if it was—I was a husband and a father and I did what I had to do to protect my family." *Id.* at 58. Further, Bufftton stated that ADA Preate and the troopers told him that they could not formally offer a deal because "it would look like my testimony was bought." *Id.* Bufftton stated that the Commonwealth never followed through on its assurance that it would help him with expunging his record. *Id.* at 59–60.

On cross-examination, Bufftton averred that he had testified truthfully at Appellant's three trials. *Id.* at 61. When asked whether he told the courts everything he knew of the murders, Bufftton responded: "The only thing I told them is that Marty was with me from, you know, like I said, 11:45 until the next day." *Id.* Moreover, Bufftton acknowledged that this statement was true, and would have remained his truthful

testimony even if the Commonwealth had arrested and prosecuted Nancy for arson. *Id.* at 62.

Nancy, who during Appellant's 2002 trial testified **on behalf of Appellant,** testified at the PCRA hearing that she had attended a meeting between Buffton and ADA Preate and some police officers. There, she learned that she would not be arrested in connection with her role in the arson if Buffton testified regarding his claim that Martin was with him at the time the murders were committed. N.T. PCRA Hearing, 8/12/08, at 18–20, 22–23. She stated that the Commonwealth's representations regarding Buffton serving limited jail time for the arson and her not being charged with the crime were not reduced to writing because the Commonwealth representatives "kept telling" Buffton that "There's no deal. There's no deal." *Id.* at 23, 27, 29. Nancy denied that her PCRA testimony could be interpreted as evidencing her belief that the Commonwealth had "forced ... an alibi." *Id.* at 27. To her knowledge, Martin had been with Buffton on the night of the murders, but because she had not been with them, she could not say that he was actually there. *Id.*

The PCRA court found significant Buffton's testimony that even had the Commonwealth not made any offers, he would still have testified that Martin had been with him on the night of the murders, thus providing Martin his alibi. PCRA Court Opinion, dated 2/27/09, at 53–54. Although not so stating, the PCRA court apparently found Buffton's testimony on this point to be credible. The court then opined that, "assuming arguendo that the Commonwealth had provided the alleged considerations to Buffton in exchange for his testimony, [Appellant] has not established the requisite prejudice to prove a *Brady* violation." *Id.* at 54. The court noted that the jury had heard "considerable evidence and argument with respect to any leniency and considerations provided to Martin Chmiel and Buffton in return for their testimony in this case." *Id.* The court further observed that Nancy was a key witness for the defense, and evidence regarding her role in the arson would have served to impeach her credibility to the jury, undermining her testimony. Thus, the PCRA court reasoned

that had the defense provided the jury with evidence regarding Nancy's role in the arson and her role in the "understanding" Buffton had with the Commonwealth, Appellant's defense would have been prejudiced. *Id.*

█ Here, Appellant now asserts that the evidence regarding the understandings or "deals" with Martin and Buffton, and the leniency allegedly afforded these witnesses by the Commonwealth in exchange for their testimony, would have had a more significant impact had the jury also heard an admission by the Commonwealth that it, in fact, had made such "deals." Appellant asserts that the Commonwealth should not be rewarded for its failure to adhere to the dictates of *Brady*. Appellant's Brief at 35–39; Appellant's Reply Brief at 6–9. We emphasize, however, that because Appellant has waived his *Brady* claims, his current argument must be viewed only through the lens of counsel ineffectiveness. *See, e.g., McGill,* 832 A.2d at 1023; *see also Commonwealth v. Ligons,* 601 Pa. 103, 971 A.2d 1125, 1146–47 (2009) (rejecting the argument that *Brady* claims cannot be waived because waiver would result in an unjust reward to the Commonwealth for withholding information). Viewing Appellant's arguments through the lens of counsel ineffectiveness, we conclude that they are meritless.

█ First, Appellant has failed to establish that trial counsel were deficient in their advocacy of the issue of the reliability of the trial testimony of Martin and Buffton. Appellant asserts that the missing piece of critical information was the existence of the Commonwealth's admission of an "understanding" or deal between it and Martin and it and Buffton. However, at the PCRA hearing, Appellant presented no evidence with respect to any pre-trial contact or "deal" between the Commonwealth and Martin, or any favorable treatment of Martin not already brought out by counsel at trial. With respect to the Commonwealth's pre-trial contact with Buffton, Appellant's PCRA evidence consisted principally of details regarding discussions between the Commonwealth and Buffton. However, trial counsel **had** provided evidence to the jury

of the fruit of that discussion, namely, the leniency of Buffton's sentence and Buffton's subsequent favorable treatment at resentencing through the assistance of the Commonwealth. Further, trial counsel presented to the jury evidence that Buffton had not provided restitution for his significant insurance fraud. Trial counsel argued vigorously to the jury that Martin's and Buffton's respective testimonies concerning Martin's alibi should be disregarded because of the favoritism shown them by the Commonwealth regarding their arson crimes and an apparent "deal" that they had struck with the Commonwealth.

At best, the PCRA hearing produced evidence that Nancy would not be prosecuted for her crimes related to the arson if Buffton would testify at Appellant's trial. As the PCRA court noted, however, Nancy was a trial witness for Appellant, and her exposure as a co-conspirator in the arson could have damaged her testimony in the eyes of the jury. "[W]e do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis." *Washington*, 927 A.2d at 594. Here, it would have been eminently reasonable for trial counsel not to have exposed Nancy's role as a criminal co-conspirator, particularly where counsel had already established solid evidence of the Commonwealth's otherwise favorable treatment of Buffton with respect to his trial testimony.

Second, with respect to the merits of Appellant's underlying claim, we conclude that Appellant has failed to show that the alleged missing *Brady* evidence was "material." In this regard, we must view the question of "materiality" bearing in mind the fact that the testimony of Martin and Buffton, which Appellant wished to impeach further with additional evidence of a Commonwealth deal or understanding, was offered at Appellant's third trial, held nearly two decades after Martin and Buffton had served their sentences for arson. Thus, Appellant's argument that this testimony was tainted by any understanding or deal the witnesses had had with the

Commonwealth is rather thin. These witnesses had long ago served their sentences and thus faced no further repercussions from the Commonwealth for their arson crimes. Indeed, the lack of potential repercussions from the Commonwealth is evidenced by the fact that Nancy did not testify for the Commonwealth, but for Appellant at his last two trials.

Further, the PCRA court found credible Bufton's testimony that he would have testified in any event, and that he had truthfully testified at trial regarding Martin's alibi. Accordingly, any additional evidence of a deal or understanding between Martin and the Commonwealth and/or Bufton and the Commonwealth would not have been material under the circumstances. *See Paddy*, 15 A.3d at 450 ("Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

The burden rests with Appellant to "prove, by reference to the record, that evidence was withheld or suppressed by the prosecution." *Porter*, 728 A.2d at 898. Here, the evidence brought forth at the PCRA hearing reaffirmed what trial counsel had brought forth at trial. The Commonwealth told Bufton that there was no deal; however, Bufton received favorable treatment from the Commonwealth, and Bufton asserted that he would have testified truthfully on Martin's behalf notwithstanding. There is absolutely no basis to conclude that trial counsel rendered less than effective advocacy on the issue of the favorable treatment afforded Martin and Bufton. Because trial counsel were not ineffective, appellate counsel were not ineffective for raising a meritless claim.

3. **Did trial counsel render ineffective assistance by failing to investigate and present witnesses to challenge the identification of Appellant's car?**

Appellant drove a distinctive car, a large powder blue Pontiac Grand Prix sedan with a prominent grill and a hood

ornament. *See* Appendix to Appellant's Petition for Writ of Habeas Corpus and for Collateral Relief from Criminal Conviction pursuant to the PCRA, filed 6/30/08, Tab 27; N.T. Trial, 8/28/02, at 165, 174. At trial, the Commonwealth presented the testimony of Linda Sinkevich and Mark Sinkevich, who resided one block from the Lunario home. Linda testified that at approximately 11:45 p.m. on September 20, 1983, stirred by the barking of her dogs, she looked out of her front window and saw a vehicle parked "nose to nose" with her car at the curb in front of her house. She testified that the lighting conditions were sufficient for her to describe the vehicle as a large powder blue car with a shiny grill and a hood ornament. She testified that the vehicle was not parked on the street when she awoke in the morning.

Linda was able to identify the car to the police in a photograph several days after she had observed it. Nine days after the murders, Linda picked the car out of an array of vehicles parked at the State Police garage. The car she identified belonged to Appellant.

Mark Sinkevich testified that when he arrived home between 2:15 a.m. and 2:30 a.m. on September 21, 1983, he also saw a vehicle parked bumper-to-bumper to his wife's vehicle. He further testified that the vehicle was no longer on the street when he awoke and then later left the house at 8:30 a.m. the next morning.

In rebuttal, Appellant presented the testimony of the next-door neighbor of the Sinkeviches, Mary Ann Pelak. Pelak testified that the street was generally dimly lit and that the lighting conditions on the street in September 1983, were very poor. She further testified regarding the lengthy distance between streetlights near her house and that of the Sinkeviches; and she asserted that the lighting conditions were so poor on the street that a person would not be able to ascertain the color of a vehicle parked on the street at night. At closing argument, Appellant's trial counsel emphasized Pelak's testimony in an effort to raise a reasonable doubt regarding the accuracy of Linda Sinkevich's testimony.

Here, Appellant clearly cannot claim that trial counsel provided deficient advocacy by **not** investigating whether there was any evidence to rebut the testimony of Linda Sinkevich. His trial counsel certainly had investigated to the extent that they were able to obtain a significant rebuttal witness: Linda Sinkevich's next-door neighbor. Thus, in his present argument, Appellant contends that trial counsel's investigation was not searching enough, and that appellate counsel were ineffective for having failed to raise and argue this point as well.

At his PCRA hearing, Appellant presented the testimony of two former neighbors of the Sinkeviches, Betty Ann and David Karr; the man who had purchased the Sinkevich house in 1991, Joseph Sepaniak; and Mary Ann Pelak's sister, Florence Pelak, who did not live on the street, but often visited her sister. These witnesses corroborated Mary Ann's testimony that the nighttime visibility and lighting conditions on the street were poor until the more recent addition of augmented street lighting. The Karrs lived across the street from the Sinkeviches and testified that they were unable to ascertain the details of vehicles parked on the street at night from their residence. Florence Pelak described her sister's street as very dark, and testified that she was unable to ascertain the details of vehicles parked on the street at night from her sister's residence. Sepaniak testified that, during evening hours, he is unable to identify the make or model of any car parked on the street from the window of the house he had purchased from the Sinkeviches. Another witness, Gary Hendrix, a defense investigator, took measurements on the street, testifying that it was 43 feet from the Sinkevich porch to the curb, 180 feet to the relevant spot on the curb from one streetlight and 249 feet from another streetlight.

As with Mary Ann Pelak, none of these witnesses could testify regarding the particular conditions on the night of September 20–21, 1983, from the vantage point of Linda Sinkevich or otherwise. Sepaniak admitted to the court that he had never had any occasion to look out of his window for vehicles. N.T. PCRA Hearing, 8/11/08, at 21. However, these witnesses also testified that it was not unusual for strange

vehicles to be parked on the street because there was a nearby bar, and they stated that they would have testified at trial regarding this knowledge had they been asked by Appellant's counsel.

Appellant contends that because evidence that Appellant's vehicle was parked near the scene at the time of the murders was a critical piece of information, trial counsel was ineffective for failing to secure the testimony of Appellant's PCRA witnesses to help bolster Mary Ann Pelak's rebuttal testimony. In order for Appellant to prevail on this claim, he needs to prove that his counsel were ineffective to the extent that counsel's advocacy "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(i), (ii). More specifically, in our review of whether Appellant has cleared this significant hurdle of proof, "we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis." *Washington,* 927 A.2d at 594. We will conclude that counsel's chosen strategy lacked a reasonable basis here only if Appellant proves that "an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Williams,* 899 A.2d at 1064 (citation omitted). Further, Appellant must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's ineffectiveness. *Dennis,* 950 A.2d at 954.

Here, the PCRA court determined that Appellant's claim must fail because (1) he failed to show that the additional testimony, had it been elicited by his counsel at trial, would have resulted in a reasonable probability that the outcome of the proceedings would have been different; (2) even if Appellant's counsel had been able to successfully rebut the testimony of Linda Sinkevich with the PCRA testimony he had elicited, the remainder of the trial evidence, which the court set forth in detail as recounted from our decision in *Chmiel III, supra,* was more than sufficient to establish Appellant's guilt; and (3) the PCRA evidence that Appellant brought forth

was, at best, cumulative of the testimony of Mary Ann Pelak and, thus, subject to exclusion by the trial court. *See Commonwealth v. Bridges*, 563 Pa. 1, 757 A.2d 859, 875 (2000) ("[A] trial court may properly exclude evidence that is cumulative of other evidence.").

Appellant contends that the testimony regarding the lighting conditions on the street where Linda Sinkevich saw a vehicle resembling Appellant's, presented at his PCRA hearing, was not cumulative of the testimony of Mary Ann Pelak, as it included details not brought forth by Mary Ann, including placement of the street lighting and evidence that strange cars would often park on the street. However, the fact remains that no witness called by Appellant during his PCRA hearing could, with any better information than that given by Mary Ann Pelak, rebut the testimony of Linda Sinkevich, who had a unique vantage point and specifically observed a distinctive vehicle parked "nose to nose" with her vehicle at the relevant time. Based on this fact, there is no basis to conclude that trial counsel inadequately investigated and prepared for this issue, or otherwise rendered deficient advocacy with respect to this issue. As the underlying issue lacks merit, appellate counsel were not ineffective for failing to raise this issue on direct appeal.

4. **Is Appellant entitled to relief from his conviction because of numerous errors relating to the Commonwealth's introduction of inadmissible, unreliable hair comparison evidence[;] and was defense counsel ineffective for failing to seek exclusion of this evidence, rebut any inference of guilt arising from the evidence, or object to the prosecutor's misrepresentation to the jury concerning the evidence?**

This issue stems from the trial testimony of Commonwealth expert, George Surma, a twenty-seven year forensic scientist with the Pennsylvania State Police, who, at the time of Appellant's third trial, had testified as an expert in forensic microscopy or electrophoresis on three to four hundred previous occasions. In addition to having analyzed blood and fiber

samples found at the murder scene, Surma had analyzed and testified with respect to six hair strands taken from the sweater sleeve mask that was found at the Lunario home. His analysis involved using a comparison microscope to detect up to fourteen possible characteristic features of different components of the hair. Surma testified that, based on his analysis, (1) one hair strand was "microscopically similar" to hair samples taken from Appellant, Martin Chmiel, and Victor Lunario; (2) three hair strands were "microscopically similar" to hair samples taken from Angelina Lunario; and (3) the remaining two hair strands were "microscopically similar" to hair samples taken from Appellant, but not to any hair samples taken from Martin or any of the murder victims. With respect to the latter two hair strands, Surma stated that his analysis ruled out Martin or the Lunarios as a source of those two hair strands. N.T. Trial, 8/27/02, at 18–23.

Surma was subjected to vigorous cross-examination by Appellant's counsel. Surma admitted that DNA testing is more precise than comparative microscopical analysis and that the advent of DNA analysis had greatly changed the field of forensics since the time he had examined the hair samples and other evidence in 1983 and 1984.[8] *Id.* at 24. Surma further agreed that, at best, a scientist could only state that a hair comparison analysis could only reflect whether the hairs were "microscopically similar," not "microscopically the same," although the prosecutor had used the expression "microscopically the same" during some of his opening and closing remarks. *Id.* at 26.[9] Surma further admitted that it is possible to examine two hair strands coming from the same head using the comparative analysis method that he had used in this case, only to find that the two hair strands are **not** microscopically

8. Surma also did a second testing using hair obtained from Appellant in 1994. N.T. Trial, 8/27/02, at 22.

9. Surma's trial testimony modified his pre-trial expert report, wherein he stated that the hair comparisons bore the **same** microscopical characteristics as Appellant's hair or the hair of Martin and Victor Lunario. Surma testified that it is more precise to characterize the hair sample comparisons as "microscopically similar." N.T. Trial, 8/27/02, at 26, 52–54.

similar. *Id.* at 26–27. He asserted that neither he nor any analyst could testify that one particular hair came from one particular person. *Id.* at 30.

Additionally, Surma admitted that in order to achieve an accurate hair comparison analysis, the collection of hair samples must have been made in accordance with the established scientific protocol. This protocol requires the collection from five regions of the head of five strands of hair each. Without such representative sampling, the microscopic results could be skewed. Surma relied upon the state troopers in the field to obtain the necessary samples, who had been trained to collect the appropriate samples. *Id.* at 27–29. Surma could not say that the hair strands taken from the sweater sleeve had not been "contaminated" by the trooper, who might have mistakenly retrieved his own hair that might have fallen on the sleeve undetected. *Id.* at 35. Surma could not say to the jury that any one hair is a hair from Appellant. *Id.* at 45. Surma also admitted on cross-examination that he did not conduct a one-to-one hair comparison between Appellant and Martin. *Id.* at 46.

On redirect examination, Surma testified that, in his professional opinion, he felt he had a sufficient hair sample from Martin to make the necessary comparisons and would have asked for more hair if he had felt otherwise. *Id.* at 51. For this reason, Surma could opine to a reasonable degree of scientific certainty that Martin could be excluded as the source of the two hairs that were "microscopically similar" to hair samples taken from Appellant, but not to any hair samples taken from Martin or any of the Lunarios. *Id.* at 52. Surma then observed that hair analysis could exclude someone or include someone as a "possible source," repeating the phrase "possible source." *Id.* at 54.

On re-cross-examination, Surma testified that when he had tested the hair strands in 1983 or 1984, he had no idea how Martin's hair had been collected, and therefore he did not know whether Martin's hair had come from only one region and not the requisite five regions. *Id.* at 56–57. Accordingly, Surma admitted that he would have had no reason to request

additional and more representative samples of Martin's hair. *Id.* at 57.

In his PCRA argument, Appellant raised three distinct claims of alleged counsel ineffectiveness with respect to the "hair" issue. These claims are that trial counsel were ineffective for not (1) seeking an exclusion of the microscopical hair analysis testimony of Surma pursuant to *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923); (2) hiring an expert to contradict Surma's testimony; and (3) objecting to purportedly improper remarks regarding Surma's evidence made by the prosecutor in opening and closing remarks, or requesting a curative instruction from the court concerning these remarks. *See* Appellant's Brief at 69. Appellant presents a layered ineffectiveness claim, asserting that appellate counsel were ineffective for failing to argue trial counsel's deficiencies in these matters.

In support of his argument, Appellant presented the PCRA hearing testimony of Samuel James Palenik, a forensic chemical microscopist, who owns a laboratory in Illinois and teaches at, among other venues, crime labs around the country. Further, he speaks at worldwide venues on the subject of forensic microscopy, which he defined as the study of microscopic particles for various purposes, including comparison. N.T. PCRA Hearing, 12/15/08, at 64–66. He has taken an FBI course in hair analysis and was friends with "probably the best hair examiner in the world." *Id.* at 67.

Palenik reviewed Surma's "bench notes," which are the notes taken by an analyst contemporaneously with the examination. Palenik found Surma's notes inadequate or incomplete, making it difficult for him to ascertain whether Surma's testing was reliable. *Id.* at 70, 78.[10] Palenik further noted that the relevant hair strands no longer existed, having been consumed by DNA testing, nor were there any photomicrographs taken of the hair. Palenik defined photomicrographs

10. However, this witness was able to view additional documents from Surma's report at the PCRA hearing, which Palenik had not previously seen. *See* N.T. PCRA Hearing, 12/15/08, at 107–18. Palenik acknowledged that there are no uniform guidelines for bench notes. *Id.* at 169.

as photographs of material taken through a microscope. He therefore opined that it was not possible for him to perform a comparison with Surma's findings. *See id.* at 75–78. In this regard, he testified that had Appellant's counsel hired someone like himself in 2002 to review Surma's conclusions, it would have been in vain because the hair no longer existed and there were no photomicrographs of the hair. *Id.* at 79–80; *see also id.* at 124, 132–34. Penalik then testified, however, that he could not do a scientific comparison from photomicrographs alone. *Id.* at 152.

Palenik also testified that the prosecutor's opening statement comment to the jury that the microscopical hair evidence was physical evidence of Appellant's guilt was "not a good scientific statement." *Id.* at 80. He explained that scientists determine facts, not guilt or innocence. *Id.* He further explained that there are only so many characteristics that may be examinable by microscopy, allowing only the **possibility** that the hair comparisons show a correspondence with one individual. *Id.* at 81. Palenik explained that an analyzed hair sample could also be associated with others who have the same microscopic anatomy. *Id.* at 81, 153. However, he admitted that this possibility does not "take away from the value of a microscopic hair comparison. There are very good uses for that." *Id.* at 82. Rather, Palenik asserted, there are simply limitations respecting microscopy. *Id.*

Palenik further testified that forensic scientists do not use the word "match" when talking about hair comparisons, and that microscopically similar hair does not permit one to make the leap that the hair samples absolutely came from the same person. *Id.* at 82–83. He testified that relevant FBI reports contain a warning that "microscopic hair comparison is not a form of exact personal identification." *Id.* at 81. Further, he opined that because hair microscopy does not yield mathematical data, as do some other scientific tests, "it needs to be backed up" by the examination of a second hair examiner. *Id.* at 87. Palenik testified that certain guidelines require such second examination, and that prior to the institution of these guidelines, "the best laboratories" would have followed the

practice of using two examiners. Palenik mentioned that as of the date of his 2008 testimony, the City of Houston was rebuilding its crime lab because it only had one hair examiner. *Id.* From his review of Surma's records, Palenik could not tell if the comparison microscopy of the hairs taken from the sweater sleeve and those of Appellant, his brother, and the Lunarios was checked by a second scientist. *Id.* at 88.

In sum, Palenik testified that microscopical hair analysis has value as an investigative tool, but it cannot be used for positive identification. *Id.* at 90–91. In response to Appellant's counsel's direct question, Palenik agreed that microscopical hair analysis can be referred to as "junk science" when it is used to establish physical evidence of guilt without acknowledging the limitations of the science. *Id.* at 91. Palenik further testified that he is "anecdotally aware" of incidents where DNA analysis has established that microscopically similar hair samples do not belong to the same person. He also acknowledged occurrences of the reverse: cases where DNA analysis confirmed that microscopically similar hair samples do belong to the same person. *Id.* at 92.

### (a) *Frye* Challenge.

Pennsylvania Rule of Evidence 702 allows for the admission of expert testimony where scientific, technical, or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue. Pa.R.E. 702. The *Frye* test is considered a part of Rule 702 and is used to evaluate **novel** scientific evidence. *Commonwealth v. Dengler,* 586 Pa. 54, 890 A.2d 372, 380–81 (2005).

At its core, the *Frye* test is based on the following principles:

Just when a scientific principle or discovery crosses the line between the **experimental** and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony

deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Dengler, supra* at 380–81 (quoting *Frye,* 293 F. at 1014; emphasis added).

■ "Admissibility of [ ] scientific evidence depends upon the general acceptance of its validity by those scientists active in the field to which the evidence belongs." *Id.* at 381 (quoting *Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277, 1281 (1977)). Our rationale for this approach to the admissibility of such evidence is as follows:

The requirement of general acceptance in the scientific community assures that those most qualified to assess the general validity of a scientific method will have the determinative voice. Additionally, the *Frye* test protects prosecution and defense alike by assuring that a minimal reserve of experts exists who can critically examine the validity of a scientific determination in a particular case. Since scientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury of laymen, the ability to produce rebuttal experts, equally conversant with the mechanics and methods of a particular technique, may prove to be essential.

*Id.* (quoting *Topa, supra* at 1282).

■ We have also determined, however, that the party desiring to introduce scientific evidence is not required to prove that the scientific community has also generally accepted an expert's conclusion. "We have never required and do not require such a showing. This, in our view, is the sensible approach, for it imposes appropriate restrictions on the admission of scientific evidence, without stifling creativity and innovative thought." *Grady v. Frito–Lay, Inc.,* 576 Pa. 546, 839 A.2d 1038, 1045 (2003). In *Grady,* we held that *Frye* would remain the governing Pennsylvania standard, and rejected adoption of a more recent federal standard represented by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579,

113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Grady, supra* at 1044–45.

■ Finally:

This Court has made it clear that Frye is not implicated every time science comes into the courtroom; rather, it applies only to proffered expert testimony involving **novel** science. What constitutes novel scientific evidence has historically been decided on a case-by-case basis, and there is some fluidity in the analysis; indeed, science deemed novel at the outset may lose its novelty and become generally accepted in the scientific community at a later date, or the strength of the proponent's proffer may affect the *Frye* determination.

*Dengler, supra* at 382 (citations omitted; emphasis added).

Appellant's *Frye* challenge is an attack on the science of microscopy, particularly hair microscopy. In support, he cites a 1995 federal district court decision from Oklahoma that determined that microscopical hair analysis was unreliable and therefore constituted inadmissible evidence. *See Williamson v. Reynolds,* 904 F.Supp. 1529, 1558 (E.D.Okla.1995). However, Appellant ignores the many jurisdictions that, prior to his 2002 trial, had determined that human hair analysis by microscopical comparison is an accepted and reliable scientific method or technique.[11] Moreover, Appellant fails to mention that *Williamson,* in significant part, based its holding on the newer federal standard represented by *Daubert,* which this Court has rejected. *Williamson, supra* at 1556–58.

11. As compiled by *Johnson v. Commonwealth,* 12 S.W.3d 258, 263 (Ky.1999), these jurisdictions include *McGrew v. State,* 682 N.E.2d 1289 (Ind.1997); *Commonwealth v. Tarver,* 369 Mass. 302, 345 N.E.2d 671 (1975); *People v. Vettese,* 195 Mich.App. 235, 489 N.W.2d 514 (1992); *State v. White,* 621 S.W.2d 287 (Mo.1981); *State v. Harrison,* 218 Neb. 532, 357 N.W.2d 201 (1984); *Bolin v. State,* 114 Nev. 503, 960 P.2d 784 (1998), *cert. denied,* 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999); *People v. Allweiss,* 48 N.Y.2d 40, 421 N.Y.S.2d 341, 396 N.E.2d 735 (1979); *Bryan v. State,* 935 P.2d 338, 359 n. 62 (Okla.Crim.App. 1997), *cert. denied,* 522 U.S. 957, 118 S.Ct. 383, 139 L.Ed.2d 299 (1997); *State v. Lerch,* 296 Or. 377, 677 P.2d 678 (1984); *State v. Lord,* 117 Wash.2d 829, 822 P.2d 177 (1991), *cert. denied,* 506 U.S. 856, 113 S.Ct. 164, 121 L.Ed.2d 112 (1992).

Appellant does acknowledge that at the time of his trial, a Pennsylvania Superior Court decision had determined that microscopical hair analysis met the *Frye* test and constituted relevant, admissible evidence. *Commonwealth v. McCauley*, 403 Pa.Super. 262, 588 A.2d 941 (1991). However, Appellant argues that, because the defendant in *McCauley* was later able to use DNA evidence in a PCRA proceeding to disprove that the hair at issue belonged to him, the continued vitality of the 1991 decision is questionable. *See* Appellant's Brief at 68. The Commonwealth responds that Appellant neglected to mention that the defendant was denied PCRA relief. Commonwealth's Brief at 48 n. 8.

The remainder of Appellant's argument is cursory:

A number of cases around the nation have resulted in individuals exonerated on the basis of faulty microscopic hair analysis evidence [citing by footnote to a 2006 law review article]. Given this Court's dearth of precedent on the issue and the increasingly high error rates using microscopy, trial counsel's failure to challenge the admission of Surma's testimony constitutes deficient performance. Reasonable capital counsel would have raised such a challenge.

Appellant's Brief at 68–69.[12]

Appellant's argument regarding *Frye* is patently meritless. It is based on one federal district court case that, in turn, based its holding on a federal standard that this Court has specifically rejected. It ignores the fact that at the time of Appellant's trial, a vast number of jurisdictions had determined that human hair analysis by microscopical comparison is an accepted and reliable scientific method or technique. In fact, one of those jurisdictions was Pennsylvania. *See McCauley, supra.* Appellant's ineffectiveness claim is, moreover, based in large part on alleged events occurring many years

12. Appellant acknowledges that at the post-verdict stage, his appellate counsel raised an unsuccessful ineffectiveness claim against trial counsel for failure to raise a *Frye* challenge to Surma's testimony. However, appellate counsel did not raise this ineffectiveness claim on direct appeal. Appellant asserts that such failure to pursue demonstrates appellate counsel ineffectiveness.

after Appellant's trial, rather than the state of the law at the time of his trial.

We do not discredit the notion, which Appellant appears to advance, that a once-viable science may lose its wide acceptance in the scientific community and may be challenged pursuant to Rule 702.[13] However, Appellant does not provide any support for the view that as of Appellant's 2002 trial, forensic hair microscopy was no longer an accepted science. In fact, the record establishes just the opposite. Not only does Appellant ignore the evidence given by Surma at trial regarding the scientific basis, acceptance, and reliability of forensic microscopy, limited though it may be, but Appellant also astonishingly ignores the more compelling evidence given by Appellant's own witness at the PCRA hearing, upon which Appellant heavily relies for his other arguments herein.

At the PCRA hearing, Palenik referred to forensic science as a "real science," and forensic microscopy as a "recognized science." N.T. PCRA Hearing, 12/15/08, at 71, 138. He acknowledged that his testimony regarding this science had never been precluded pursuant to *Frye*. *Id.* at 138–39. He patiently, and in great detail, explained to the PCRA court how forensic hair microscopy works as a science. *Id.* at 92–97, 146–54. He observed that side-by-side hair comparison is "done ... objectively." *Id.* at 84. He testified that scientists had been comparing hair strands microscopically since approximately the 1880s. *Id.* at 88, 146. He noted that microscopical hair analysis is performed in crime labs run by the FBI, the Chicago police, and the Houston police. *Id.* at 87. He confirmed Surma's description of the science of hair microscopy. *See, e.g., id.* at 100 (mirroring Surma's trial testimony that accurate analysis is dependent upon the retrieval of hair from different regions of head).

13. However, Appellant has not raised a challenge pursuant to Rule 702, but rather only under one of its components: *Frye.* We are not aware of any case that applies *Frye* to the circumstance of an accepted scientific method losing its widely-held acceptance. At any rate, Appellant does not develop a relevant argument on this point.

Thus, Palenik's PCRA hearing testimony not only shows that hair microscopy is a recognized science, not a **novel** one, even up to the end of 2008, but his testimony evidences "that a minimal reserve of experts [in this field] exists who can critically examine the validity of a scientific determination in a particular case." *Dengler, supra* at 381 (describing one of the principle concerns of *Frye* ). Moreover, Surma had twenty-seven years of experience in forensic microscopy and had previously testified as an expert in microscopic hair analysis on more than 300 occasions. For this reason, the trial court accepted him as a competent expert witness. N.T. Trial, 8/27/02, at 4–6. For a great variety of reasons, Appellant's underlying *Frye* issue lacks merit; thus, trial counsel were not ineffective for failing to make a *Frye* challenge. Accordingly, Appellant's layered ineffectiveness claim is wholly without merit.

### (b) Failure to hire rebuttal expert.

Without citation to the trial record, Appellant asserts that one Commonwealth witness (a state trooper) described Surma's microscopical hair analysis as "vital to the case." Appellant's Brief at 67. Appellant also asserts that the hair determined to be microscopically similar to Appellant's hair was the only physical evidence linking him to the crime. Without any mention of the remainder of the Commonwealth's extensive case against him, Appellant baldly asserts that the hair evidence played "a central role" in Appellant's case. *Id.* Without citation to any analogous authority, Appellant asserts that the foregoing assertions establish that trial counsel were ineffective for failing to hire an expert witness to rebut Surma's testimony.

"Where a claim is made of counsel's ineffectiveness for failing to call witnesses, it is the appellant's burden to show that the witness existed and was available; counsel was aware of, or had a duty to know of the witness; the witness was willing and able to appear; and the proposed testimony was necessary in order to avoid prejudice to the appellant." *Commonwealth v. Wayne,* 553 Pa. 614, 720 A.2d 456, 470

(1998). "The mere failure to obtain an expert rebuttal witness is not ineffectiveness. Appellant must demonstrate that an expert witness was available who would have offered testimony designed to advance appellant's cause." *Id.* at 470–71. "Trial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony. Additionally, trial counsel will not be deemed ineffective for failing to call a medical, forensic, or scientific expert merely to critically evaluate expert testimony [that] was presented by the prosecution. Thus, the question becomes whether or not [defense counsel] effectively cross-examined [the Commonwealth's expert witness]." *Commonwealth v. Marinelli,* 570 Pa. 622, 810 A.2d 1257, 1269 (2002) (citations and quotation marks omitted).

 Focusing on the latter point first, it is beyond peradventure that Appellant's trial counsel conducted skilled and thorough cross-examination of Surma, as evidenced by our summary of this cross-examination. Appellant's counsel was able to show not only the weaknesses and limitations of the science of forensic hair microscopy, but also called into question whether the hair collection process—from both the sweater sleeve and from the individuals suspected of being the source of the hair samples found on the sleeve—had been done in accordance with what was required to conduct an accurate and contamination-free hair analysis. As the PCRA court observed, Palenik's testimony added little more than that established by Appellant's counsel on his cross-examination of Surma and of the trooper who had collected the relevant hair samples. *See* PCRA Court Opinion at 73–74.

Appellant disputes the PCRA court's conclusions. He contends that Palenik's testimony established, in addition to the evidence derived from the cross-examination of Surma and the trooper, that (1) the "best" practice for hair microscopy is to have a second person review the comparison; (2) there are not necessarily fourteen characteristics used to compare hair samples, as Surma had stated; and (3) Surma's bench notes were deficient. Appellant's Brief at 67.

These assertions are hardly a basis for establishing that Appellant's trial counsel was ineffective for not spending limited financial resources [14] to hire a witness to rebut Surma's testimony. Moreover, Appellant is not even forthright in his assertions. He incorrectly asserts that it is a fact that a second scientist did not check Surma's analysis, but Palenik testified that he could not say whether or not this had occurred.[15] He omits mentioning that Palenik testified that a scientist could "write up" characteristics for hair analysis that equaled the number fourteen.[16] He fails to mention that Palenik determined that the bench notes were deficient for purposes of a review of Surma's methodology and findings, but not for the analysis itself.[17] On the latter point, Appellant neglects to explain how the adequacy of the bench notes was material for the jury's evaluation, when they heard Surma's actual testimony. Moreover, Appellant never identified any witness available at the time of trial for possible rebuttal.

Once again, in order to set forth a sufficient ineffectiveness of counsel argument:

> [W]e do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis. We will conclude that counsel's chosen strategy lacked a reasonable basis only if Appellant proves that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.... [T]he petitioner must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's ineffectiveness.... [B]oilerplate allegations and bald assertions of no reasonable basis and/or

14. *See* PCRA Court Opinion at 74 (noting that Appellant was furnished with approximately $54,000 for investigations, expert witnesses, and testing of evidence).

15. Compare Appellant's Brief at 67 and N.T. PCRA Hearing, 12/15/08, at 88.

16. N.T. PCRA Hearing, 12/15/08, at 97.

17. N.T. PCRA Hearing, 12/15/08, at 78.

ensuing prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective.

*Paddy*, 15 A.3d at 442–43 (citations and quotation marks omitted).

In light of these standards, we must conclude that the PCRA court correctly determined that Appellant's claim of ineffectiveness regarding trial counsel's failure to hire a rebuttal witness is without merit. Here, because the underlying claim lacks merit, no basis exists to assert an ineffectiveness claim against trial counsel. The ineffectiveness claim against appellate counsel is, accordingly, also without merit.

### (c) Prosecutor's remarks.

▪ Appellant argues that trial counsel was ineffective for having failed to object to isolated remarks made by the prosecutor in both opening and closing statements, and for having failed to request a curative instruction with respect to these remarks. In support of his argument, Appellant selects excerpts from the following opening remarks by the prosecution, which we quote in full:

So [Appellant] gets arrested right then and there. But that's not the end of the evidence because after the arrest[,] more evidence of [Appellant's] guilt gets developed. And we come back to the mask. Remember the mask? Well when they have recovered that at the scene[, t]hey took six hairs off it. There were six human hairs on that mask. And you have to remember now this is 1983. They used the only technology that was available for hair analysis at that time[,] which was microscopic comparison.

So they took these six hairs and they compared them against hairs they took from [Appellant], hairs they took from [Martin], remember, he tried it on? And hairs that they had taken from the three deceased: Angelina, Victor and Jimmy. Because they wanted to see if these hairs matched up to any of those people.

So the first hair was inconclusive, which means as the chemist will explain to you[,] it had some characteristics that

were consistent with [Appellant], it had some characteristics that were consistent with [Martin,] and it had some characteristics that were consistent with Victor.

Now the next three hairs—we're up to four—those three had characteristics that were microscopically similar to Angelina. But the last two hairs, 14 out of 14 microscopic characteristics, conclusion, microscopically the same as [Appellant]. Physical evidence of [Appellant's] guilt. That's in 1983.

N.T. Trial, 8/19/02, at 76–78.[18]

Appellant highlights the prosecutor's statement that the two hair strands were "microscopically the same as [Appellant]. Physical evidence of [Appellant's] guilt." *Id.* at 77–78. Appellant contends that these statements misled the jury as to Surma's later testimony, injecting prejudicial unfairness into the trial. Appellant contends that the misleading statements were repeated during the prosecutor's closing arguments, which we quote in context, as distinguished from the select phrases picked out by Appellant:

Now, that brings us to George Surma. George Surma—and again, folks, it's your recollection that counts, but my memory tells me that George Surma said he uses 14 points of comparison. If I'm wrong, forgive me. I thought he said he uses 14 points of comparison.

But one thing he said all along in all of these proceedings is there was [sic] six hairs on that mask. He does microscopic comparisons, and two of those hairs, who were they similar to? Who do they microscopically match up to? Only [Appellant]. Right?

Now, he's got four others, and he says three of them are Angelina and one could be Victor, could be [Martin], could be [Appellant]. And you have to remember, [Martin's] testimony included the fact that he tried on the mask. So now you have George Surma telling you that [Martin's] telling the truth because two of those hairs are microscopi-

18. The prosecutor then continued with his opening remarks by explaining later DNA testing of hair strands that helped to confirm the results of the microscopical analysis. *See* N.T. Trial, 8/19/02, at 78–80.

cally similar not to [Martin], not to the Lunarios, to [Appellant]. That's what he told you. That's what he always said. I guess he's part of the conspiracy too.

As far as not having enough of [Martin's] hair or not having [Martin's] hair from the right parts of the head, once again, it's your recollection that counts. My recollection says when he was on the stand[,] I asked him did you have enough hair or a sufficient example of hair in order to do that comparison.

Yeah, I did.

If you didn't, would you ask for more?

Yes, I would.

Please keep your eye on the ball. George Surma, two hairs, [Appellant]. Corroboration.

N.T. Trial, 9/6/02, 175–76.[19]

Appellant's argument with respect to this closing testimony is as follows:

In this case, the prosecutor's closing comments repeatedly misstated Surma's testimony, misleading the jury into overvaluing the microscopic hair comparison evidence actually presented. In closing, the prosecutor once again used the word "match," thereby repeating and reinforcing the same improper comments that he made in opening. This repetition only enhanced the scope of the impropriety. No curative instruction was given to blunt the effect of these repeated overstatements. Moreover, the hair evidence at issue was the only alleged physical evidence that in any way connected Appellant to the crime or the crime scene. The prosecutor's overstatements regarding the value of this sole piece of physical evidence, infected Appellant's trial with unfairness,

19. With respect to the prosecutor's use of the word "corroboration," we note that the prosecutor's theme throughout his closing was that Martin's testimony regarding Appellant's detailed confession to him was corroborated by other evidence. For example, immediately prior to the prosecutor's remarks concerning Surma's testimony, the prosecutor discussed Linda Sinkevich's testimony regarding Appellant's car being parked in front of her house at a relevant time on the night of the murders. The prosecutor also referred to that testimony as corroborating Martin's testimony. See N.T. Trial, 9/6/02, 173–75.

thereby making his conviction a violation of due process of law.

Appellant's Brief at 66.

In dismissing Appellant's prosecutorial misconduct arguments, the PCRA court first noted that the prosecutor's opening argument statement that the two relevant hair strands were "microscopically the same," which was based on Surma's expert report that described the hair strands in that manner, was an "isolated" statement. As such, the court considered the remark non-prejudicial when viewed in the context of two circumstances. First, the court observed that the jury had been specifically instructed that opening statements are not to be considered as evidence. *See* N.T. Trial, 8/19/02, at 42; *see also Commonwealth v. Ligons*, 565 Pa. 417, 773 A.2d 1231, 1238 (2001) ("[A]rguments of counsel are not evidence."). Second, the court observed that Surma's actual testimony made clear that microscopical hair comparison could at best be considered "microscopically similar." PCRA Court Opinion at 75.

Regarding the prosecutor's closing remarks, the PCRA court first considered that such remarks had to be viewed within the context of the entirety of the closing arguments made to the jury. The court observed that Appellant had devoted significant time to criticizing the reliability and methodology of the Commonwealth's hair comparison evidence, based on Surma's testimony and that of the state trooper who had collected the hair. *See* N.T. Trial, 9/6/02, at 54–56, 75–78. The court then observed that the prosecutor's use of the word "match" in his closing remarks "occurred within the qualifying context of his repeated use of the term 'similar.'" PCRA Court Opinion at 76. The court determined that the single use of the word "match," being one fleeting reference within an entire closing argument, did not cause the jury to form a fixed hostility toward Appellant nor prevent the jury from rendering a fair verdict. *Id.*; *see also Commonwealth v. Steele*, 599 Pa. 341, 961 A.2d 786, 832 (2008) (holding that a fleeting reference within the context of an entire closing

argument is not prejudicial, citing numerous sources of authority).

In accord with the long-standing principle that a "prosecutor must be free to present his or her arguments with logical force and vigor," this Court has permitted prosecutorial advocacy "as long as there is a reasonable basis in the record for the [prosecutor's] comments." *Commonwealth v. Robinson*, 581 Pa. 154, 864 A.2d 460, 516–17 (2004). Prosecutorial comments based on the evidence or reasonable inferences therefrom are not objectionable, nor are comments that merely constitute oratorical flair. (*Tedford*, 960 A.2d at 33). Furthermore, the prosecution must be permitted to respond to defense counsel's arguments. *Id.* Any challenged prosecutorial comment **must not be viewed in isolation,** but rather must be considered in the context in which it was offered. *Robinson, supra* at 517.

It is improper for a prosecutor to offer his or her personal opinion as to the guilt of the accused or the credibility of any testimony. *Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102, 112 (2004). However, it is well within the bounds of proper advocacy for the prosecutor to summarize the facts of the case and then ask the jury to find the accused guilty based on those facts. *See id.*

The standard by which the court considers allegations of improper prosecutorial comments is a stringent one:

Comments by a prosecutor constitute reversible error only where their unavoidable effect is to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a fair verdict.

*Tedford, supra* at 33 (citation omitted).

We agree with the PCRA court that Appellant is not entitled to relief. With respect to the prosecutor's opening remarks, the PCRA court correctly identified the flaws in Appellant's argument. First, as the PCRA court observed, the jury was instructed by the trial court that opening re-

marks and argument of counsel do not constitute evidence that is to be weighed. "The jury is presumed to have followed the court's instructions." *Commonwealth v. Flor*, 606 Pa. 384, 998 A.2d 606, 632 (2010). Second, as the PCRA court also observed, the jury heard testimony from Surma regarding the proper evaluation of hair comparison analysis. Moreover, as addressed previously, Appellant mounted a vigorous and extensive cross-examination of Surma with respect to his scientific conclusions. In light of these factors, we must conclude that the prosecutor's isolated opening argument remark is of little consequence.

With respect to the prosecutor's closing remarks, we conclude that Appellant's characterization of them is facially incorrect and Appellant's assertions of prejudice grossly overstated. First, our review of the prosecutor's closing remarks in their entirety establishes that the prosecutor did not "repeatedly misstate[ ] Surma's testimony, misleading the jury into overvaluing the microscopic hair comparison evidence actually presented." Appellant's Brief at 66. The prosecutor's remarks do not contain "repeated misstatements." In fact, the prosecutor used the terms "similar" and "microscopically similar," and, as the PCRA court observed, used the term "match," which Appellant now objects to, within the context of describing comparison on the basis of similar components. N.T. Trial, 9/6/02, 175. In light of the detailed testimony provided by Surma on direct and cross-examinations, the prosecutor's fleeting remark concerning whether the microscopical comparison of similar features "matches up to" Appellant is wholly insufficient to support Appellant's claims. *See, e.g., Steele, supra* at 832. Moreover, Appellant's allegation that the jury connected the prosecutor's use of the term "match" in opening statements to his use of the term "match" in closing remarks, after a three-week trial involving numerous witnesses and concepts, and, as a result, became confused, prejudiced, or biased against Appellant, is one deserving of no credence whatsoever.

Further, the prosecutor's final closing remarks on this subject ("Please keep your eye on the ball. George Surma,

two hairs, [Appellant]. Corroboration." N.T. Trial, 9/6/02, 176) need not necessarily be viewed as a misconstruing of Surma's testimony. Appellant has brought forth nothing that suggests that the jury was incapable of fitting these remarks within the context of Surma's testimony. In short, Appellant does not establish that the prosecutor's closing remarks constitute misconduct. Moreover, even if these remarks could be viewed in no other light, Appellant does not establish, but simply asserts, that these remarks had the unavoidable effect of prejudicing the jury, forming in their minds a fixed bias and hostility toward Appellant such that they could not weigh the evidence objectively and render a fair verdict.

Because none of Appellant's assertions of prosecutorial misconduct during opening and closing arguments have merit, Appellant cannot satisfy the arguable merit prong of the *Pierce* test for ineffective assistance of trial counsel. Because trial counsel were not ineffective, Appellant's derivative claims of appellate counsel ineffectiveness also must fail.

5. **Were trial and appellate counsel ineffective for failing to properly raise and preserve the following issues: a) trial court error for allowing the Commonwealth to cross-examine Appellant with information derived from Attorney Kennedy's testimony at a prior PCRA hearing[;] b) trial court error for allowing the Commonwealth to utilize Appellant's post-arrest statement; c) trial counsel ineffectiveness for failing to object promptly and request a curative instruction and mistrial in response to the Commonwealth's improper and prejudicial questioning of Julie Maconeghy[;] and d) trial court error in denying a motion for change of venire and venue and appellate counsel's ineffectiveness for failing to raise this issue?**

The four issues raised hereunder are related only by the fact that they were all previously litigated and disposed of on direct appeal or, with respect to the final issue, raised at trial, but then waived for failure to pursue on post-verdict motions and appeal. Appellant raises these claims principally in the

guise of ineffectiveness of appellate counsel for failing to provide adequate stewardship in advocating these claims. Appellant also contends, generally: "To the extent trial counsel failed to effectively object to these errors, trial counsel was ineffective. To the extent direct appeal counsel failed to raise these issues under state and federal law, appellate counsel was ineffective." Appellant's Brief at 80.[20] The PCRA court simply determined that Appellant's first three claims were previously litigated and further held that the last claim was meritless. PCRA Court Opinion at 93–95.

### a) Cross-examination of Appellant

A full background regarding this issue may be found in *Chmiel III*, 889 A.2d at 525–28. Briefly, this issue is rooted in the events that secured Appellant a third trial. During his second trial, Appellant was cross-examined by the prosecutor with respect to Appellant's direct-examination testimony that he had not been at or near the Lunario house on the night of the murders and had never told anyone anything to the contrary. In an attempt to impeach this testimony, the prosecutor asked Appellant to confirm or deny the fact that he had told his first trial counsel two conflicting stories regarding his activities and whereabouts on the night of the murders. One of those stories was that he was actually outside the Lunario house on the night of the murders in order to "case it." There, he saw a person who appeared to resemble his brother, Martin, run down an alley by the Lunario house, and get in a car. Evidence that Appellant had told this story to counsel came from counsel's testimony at a 1988 PCRA hearing. On direct appeal from Appellant's second conviction, this Court determined that the prosecutor's cross-examination of Appellant on this evidence prejudicially implicated Appellant's rights to effective assistance of counsel and freedom from self-

**20.** Appellant also flatly states: "The arguments made in [his] prior pleadings are adopted herein." Appellant's Brief at 74. In a footnote to this statement, Appellant asserts: "Appellant is not raising previously litigated claims, but simply ensuring that all federal and state law arguments are preserved for review." *Id.* n. 22.

incrimination, as well as the attorney-client privilege.[21] *Commonwealth v. Chmiel,* 558 Pa. 478, 738 A.2d 406, 423–24 (1999) (*"Chmiel II "*).

Prior to Appellant's third trial, the Commonwealth sought permission to use the transcript of the Commonwealth's cross-examination of Appellant from his second trial, should Appellant testify and again state that he had not been at or near the Lunario house at the critical time. In order to avoid the prejudicial error found in *Chmiel II,* the Commonwealth indicated that it would redact any mention of Appellant's first trial attorney. The trial court permitted the Commonwealth to proceed in this manner with the understanding that if Appellant had told the story of seeing a person resembling Martin at the scene to anyone other than his counsel or other person with whom communications are privileged, then Appellant should be subject to cross-examination.

At Appellant's third trial, Appellant denied being at the scene of the murders, and on cross-examination, the prosecutor asked him whether it was true that during a particular period of five months, he had told a different story.[22] Appellant denied the prosecutor's assertions.

On direct appeal, Appellant argued that the trial court had erred by permitting such cross-examination, as it effectively circumvented the holding of *Chmiel II.* We agreed that the trial court had abused its discretion by allowing the Commonwealth to cross-examine Appellant in the manner described, based on our rationale in *Chmiel II.* However, we further determined that the trial error was harmless because prejudice to Appellant, if any, was insignificant and *de minimis. Chmiel III, supra* at 528–29.

**21.** At the 1988 PCRA proceeding, Appellant's first trial counsel divulged Appellant's two conflicting stories to explain why he did not call Appellant to testify at trial, because Appellant claimed that counsel was ineffective for not calling him to testify.

**22.** The trial court then interjected and ruled that the question was confined to anyone except "a priest or a doctor, or a lawyer … anything that would be privileged." *Chmiel III,* 889 A.2d at 526 (quoting N.T. Trial, 9/5/02, at 5–6).

In his present argument, Appellant asserts that his counsel on direct appeal were ineffective because "they failed to make a critical legal argument: the reasonable possibility that the error may have contributed to the verdict." Appellant's Brief at 74. Appellant cites no authority in support of this claim.

However, this Court in *Chmiel III* fully reviewed the ramifications of the trial court error, and we specifically concluded that such error "could not have contributed to the verdict." *Id.* at 529. Appellant's present undeveloped argument was previously litigated, and, as such, provides no basis for relief under the PCRA. 42 Pa.C.S. § 9543(a)(3).

### b) Post-arrest statement

 Again, a fuller background concerning this issue may be found in *Chmiel III, supra* at 529–31. Briefly, this issue pertains to post-arrest, post-*Miranda* statements made by Appellant to State Trooper Gerald Gaetano prior to Appellant's invoking his right to remain silent. Trooper Gaetano asked Appellant where was he "last Tuesday night." Appellant responded that he was at home watching television with his wife. When questioned further concerning his whereabouts "last Tuesday night," Appellant replied: "I don't think I better talk about that." *Id.* at 529 (quoting N.T. Trial, 8/28/02, at 169, 173; and Dkt. Entry No. 407, at 1).

Appellant averred on direct appeal and in his present PCRA petition that when he answered the trooper's first inquiry, he believed he was talking about Tuesday, September 27, 1983, which was one week **after** the murders. Appellant further avers that when the trooper inquired further, Appellant believed that the question concerned Tuesday, September 20, 1983, the day of the murders. At that point, Appellant invoked his right against self-incrimination. *See id.* n. 21; Appellant's Brief at 75.

The trial court had limited the Commonwealth's questioning of Trooper Gaetano to only those statements made by Appellant prior to Appellant's having invoked his right to remain silent. Accordingly, Trooper Gaetano's testimony was limited

to conveying Appellant's assertion that he was at home watching television with his wife "last Tuesday night." On cross-examination by Appellant's counsel, Trooper Gaetano admitted that he was unsure of the Tuesday evening to which Appellant was referring. On redirect examination, the Commonwealth attempted to question the trooper further on this issue, but the trial court sustained Appellant's objection to such line of questioning. *Chmiel III* at 530.

On direct appeal, Appellant argued that he was prejudiced by the trial court's admission of the statement of Trooper Gaetano. Appellant contended that for him to have clarified the confusion arising from the trooper's statement regarding the Tuesday night that Appellant believed the trooper was asking about, he would have been forced to disclose to the jury the fact that he had exercised his right against self-incrimination. Appellant argued that, in sum, the waiver of his constitutional rights far outweighed the probative value of Trooper Gaetano's testimony. *Id.*

> We considered and rejected Appellant's argument, holding: Appellant sought and won a prohibition of any reference to statements made after he invoked his rights. He cannot now challenge that ruling on the basis that he was somehow prejudiced by it. A party in a criminal proceeding cannot argue for a specific ruling and then, after obtaining a favorable ruling, claim that the trial judge committed an error of law in making it. Appellant had the opportunity to clarify the matter through the cross-examination of Trooper Gaetano and it was not an abuse of discretion to permit Appellant's post-*Miranda* statement, made prior to his invocation of the right to remain silent because the statement was relevant, was not prejudicial, and did not violate any constitutional right.

*Id.* at 530–31 (citation omitted).

In his present PCRA argument, Appellant contends that appellate counsel were ineffective for purportedly having only raised this issue as a violation of the Pennsylvania Rules of Evidence rather than also as due process and Fifth Amend-

ment violations. Appellant cites authority supporting his Fifth Amendment claim, and provides what he contends is evidence of the jury's confusion. That evidence consists of the fact that during guilt-phase deliberations, the jury requested information from the court as to whether there were any police reports respecting the questioning of Appellant from the time of his arrest until he was transferred to the state police barracks. *See* N.T. Trial, 9/7/02, at 85. The court and the attorneys for Appellant and the Commonwealth interpreted this request as related to Trooper Gaetano's testimony. *Id.* at 86–91. Appellant argues, without any analysis to back up this assertion, that had appellate counsel raised due process and Fifth Amendment arguments, "there is a reasonable possibility that relief would have been secured." Appellant's Brief at 77.

In response, the Commonwealth cites Appellant's brief on direct appeal and quotes that portion of the brief wherein Appellant does raise a Fifth Amendment violation argument in connection with his claim that the trial court erred by admitting Trooper Gaetano's testimony. Commonwealth's Brief at 50. We have reviewed Appellant's direct appeal brief and have confirmed that, indeed, Appellant did argue prejudice rooted in his right against self-incrimination. Appellant's Direct Appeal Brief, filed at No. 428 CAP, dated April 16, 2004, at 44. We noted this argument in *Chmiel III, supra* at 530. In fact, Appellant's direct appeal argument is plainly concerned with the idea that a clarification of Trooper Gaetano's testimony would have required Appellant to waive "a constitutionally recognized right." Appellant's Direct Appeal Brief at 44 n. 22. Thus, Appellant's present contention that appellate counsel were ineffective for having failed to argue prejudice to Appellant's constitutional rights is based on assertions not supported by appellate counsels' actual advocacy of this issue, and, in fact, is belied by appellate counsels' actual advocacy.

In *Chmiel III*, we plainly rejected Appellant's Fifth Amendment argument and further held that the admission of Trooper Gaetano's statement "did not violate any constitutional

right." *Id.* at 531. Accordingly, we agree with the PCRA court's conclusion that Appellant's Fifth Amendment claim was previously litigated, and we further hold that Appellant's "new," underdeveloped due process claim lacks merit. Accordingly, no ineffectiveness claims may successfully be based on the due process claim.

### c) Questioning of Julie Maconeghy

On direct appeal, Appellant raised an issue of trial counsel ineffectiveness with respect to counsel's advocacy regarding the testimony of Appellant's ex-wife, Julie Maconeghy. Appellant argued that the Commonwealth's impeachment questioning of Maconeghy "was improper, prejudicial, inadmissible, and amounted to prosecutorial misconduct. Appellant therefore argue[d that] trial counsel was ineffective for failing to preclude the testimony." *Id.* at 542. We rejected Appellant's argument, holding that there was no prosecutorial misconduct and that Appellant's trial counsel's advocacy on this matter constituted effective performance in furtherance of Appellant's interests. *Id.* at 542–43.

In his PCRA claim, Appellant contends once again that trial counsel was ineffective for having failed to preclude the Maconeghy testimony at issue by not "secur[ing] a pretrial rule barring this line of questioning, object[ing] immediately when the question began, or mov[ing] for a mistrial." Appellant's Brief at 78. He further argues that appellate counsel was ineffective for having failed to argue an underlying due process violation and standards for capital cases falling under the Eighth and Fourteenth Amendments. *Id.* Once again, Appellant does not develop his argument further.

It is quite apparent that appellate counsel did raise due process concerns in their argument on direct appeal, and Appellant sets forth no basis regarding why our holding in *Chmiel III* would have been any different had appellate counsel intoned the words "Eighth and Fourteenth Amendments," which is nothing more than what Appellant is doing at this juncture. Appellant's argument is patently without merit;

the issue was previously litigated, and, accordingly, no PCRA relief is due. 42 Pa.C.S. § 9543(a)(3).

### d) Change of venire or venue

 In his final claim set forth under this issue, Appellant argues that appellate counsel was ineffective for having failed to raise an issue regarding the trial court's denial of Appellant's pre-trial request for a change of venue or a change of venire. After citing to cases holding that, as a general rule, due process requires that a jury consider evidence only developed at trial and not matters from external sources, Appellant makes the following argument, which we quote in its entirety:

> In this case, Appellant was accused of the brutal murders of three elderly persons in a highly publicized crime. Appellant had been tried and sentenced to death twice before in Lackawanna County. The Commonwealth had utilized highly prejudicial aggravating evidence, which had been reported in the local media, at the penalty phases of both prior trials. Appellant also had a PCRA hearing in Lackawanna County. Due to the amount of media coverage of this case and the extensive time period over which the case had been subject to publicity, voir dire—especially voir dire by written questionnaire—was insufficient to root out possible prior information venire persons had heard about Appellant's case. Post-sentence and appellate counsel were deficient for not raising this issue, as it had been preserved on the record by trial counsel. There is no reasonable strategic basis for failure to raise on appeal a meritorious issue preserved by trial counsel. Because of the unique procedural history of this case, there is a reasonable probability that this Court would have granted relief on a venue/venire claim on appeal. Prior counsel's failure to raise this claim was prejudicial.

Appellant's Brief at 79.

Regarding a request for a change of venue/venire, we have held:

> A request for a change of venue or venire is addressed to the sound discretion of the trial court, which is in the best

position to assess the atmosphere of the community and to judge the necessity of the requested change. Absent an abuse of discretion, the trial court's decision will not be disturbed.

A change of venue becomes necessary when the trial court determines that a fair and impartial jury cannot be selected in the county in which the crime occurred. [The defendant] argues that the trial court should have made such a determination in the present case, as the case, involving as it did the heinous death of an 8–year–old child, was extremely newsworthy in the New Castle area. Ordinarily, however, a defendant is not entitled to a change of venue unless he or she can show that pre-trial publicity resulted in actual prejudice that prevented the impaneling of an impartial jury. The mere existence of pre-trial publicity does not warrant a presumption of prejudice.

There is an exception to the requirement that the defendant demonstrate actual prejudice. Pre-trial publicity will be presumed to have been prejudicial if the defendant is able to prove that the publicity was sensational, inflammatory, and slanted toward conviction, rather than factual or objective; that such publicity revealed the defendant's prior criminal record, if any, or referred to confessions, admissions, or reenactments of the crime by the defendant; or that it was derived from official police and prosecutorial reports. Even if the defendant proves the existence of one or more of these circumstances, a change of venue or venire is not warranted unless he or she also shows that the pre-trial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated.

*Commonwealth v. Karenbauer*, 552 Pa. 420, 715 A.2d 1086, 1092 (1998) (citations omitted); *see also Commonwealth v. Briggs*, 608 Pa. 430, 12 A.3d 291, 314 (2011) ("[T]he pivotal question in determining whether an impartial jury may be selected is not whether prospective jurors have knowledge of the crime being tried, or have even formed an initial opinion

based on the news coverage they had been exposed to, but, rather, whether it is possible for those jurors to set aside their impressions or preliminary opinions and render a verdict solely based on the evidence presented to them at trial.").

As is readily apparent from Appellant's cursory argument, Appellant does not even attempt to meet the requirement of demonstrating actual prejudice or proving the exception to actual prejudice. Appellant cites to **nothing** in the record, including the extensive record of the *voir dire,* which was held from August 5–9 and 12–15, 2002. Because of this wholesale deficiency, Appellant fails to demonstrate that a significant number of potential jurors had formed a fixed bias against Appellant as a result of news reports or other information. *See, e.g., Briggs, supra* at 316–17. Indeed, Appellant's contentions are nothing more than "boilerplate allegations and bald assertions of no reasonable basis and/or ensuing prejudice[, which] cannot satisfy a [PCRA] Petitioner's burden to prove that counsel was ineffective." *Paddy,* 15 A.3d at 443.

By contrast, the PCRA court examined in detail the *voir dire* and trial records. This examination showed, as confirmed by our review, "that only two of the twelve jurors who issued the verdicts in this case recalled reading or hearing some information about the Lunario murders, and both of those jurors confirmed that they would set aside and disregard whatever they may have heard or read about in this case." PCRA Court Opinion at 94 (citing to the *voir dire* notes of testimony). The PCRA court further noted that neither the defense nor the Commonwealth was required to utilize all of their available twenty peremptory challenges each in order to select the jury, such was the limited impact of pretrial publicity. *Id.*

The PCRA court also correctly determined to be relevant to this issue the fact that each juror, upon selection and at the outset of the trial, was admonished to refrain from reading, viewing, or otherwise being attentive to any media reports or other outside information regarding the case and trial. In fact, on each day of the trial, the jury was directly asked whether any juror had read, seen, or heard any news reports

or other outside information regarding the case or trial or had had discussions with any persons concerning the case or trial. *Id.* at 94–95 (citing to trial record). Our review shows that no juror had stated that he or she had been exposed to such outside information.

In *Briggs*, a capital case, we observed that of the twelve jurors who were finally selected to serve on the jury, only four had not read anything about the case or heard any reports about it on radio and television. However, of those jurors who had been exposed to media coverage, none indicated that their exposure had caused them to form fixed, unchanging opinions of the defendant's guilt. None indicated that their exposure would interfere in any way with their ability to render a verdict based solely on the evidence presented in court. Based on such a record, together with the fact that a significant number of potential jurors had not formed a fixed bias against the appellant due to news reports or other information, and the fact that a one year and nine-month span between the murder and trial had **lessened** the publicity and its impact, we held that the trial court had not abused its discretion by denying the appellant his request for a change of venue. *Id.* at 316–18; *see also Commonwealth v. Crews*, 536 Pa. 508, 640 A.2d 395, 398–99 (1994) (holding that even where there is inflammatory pre-trial publicity, an adequate cooling-off period between the publication of such material and the trial, which in *Crews* was **six to eight months**, together with the trial court's exercise of its discretion to evaluate bias and impartiality during *voir dire*, sufficiently supported the trial court's conclusion that pre-trial publicity did not prevent the capital defendant from receiving a fair trial by an impartial jury).

Here, **nineteen years** after the murders, Appellant was tried by a jury that included only two individuals who had ever heard of the murders. Moreover, this jury consisted of jurors who avowed under oath and penalty of perjury that they had no preconceived or fixed opinion of Appellant's guilt and that they could decide the case based solely on the trial evidence. Based on these circumstances, and in the absence of any

meaningful countervailing argument, we agree entirely with the PCRA court that Appellant's ineffectiveness claim against appellate counsel on the issue of a change of venire or venue is without merit.

6. **Is Appellant entitled to relief from his conviction because of numerous errors relating to the Commonwealth's introduction of inadmissible, unreliable mitochondrial DNA evidence[;] and was defense counsel ineffective for failing to seek exclusion of this evidence, rebut an inference of guilt arising from the evidence[,] and object to the prosecutor's misrepresentation to the jury concerning this evidence?**

This multi-tiered layered ineffectiveness claim is rooted in Appellant's pre-trial motion, made prior to his third trial, for DNA testing of the two hair strands that were identified by Surma through forensic microscopy as microscopically similar to Appellant's hair, but not microscopically similar to the hair of his brother Martin or any of the murder victims. *See* Issue 4. The trial court granted Appellant's motion, and mitochondrial DNA testing was performed on the two hair strands, as well as other hair strands and the sweater sleeve on which they were found, at a laboratory **mutually chosen by** Appellant and the Commonwealth. The trial court's order granting Appellant's motion also compelled Martin and Thomas Buffton to surrender hair samples for mitochondrial DNA testing. Also tested were blood samples from Appellant, Martin, and Buffton. The testing occurred in 2000 or 2001.

In his opening remarks at trial, Appellant's counsel commented upon the inconclusiveness of the DNA results. Counsel stated that no complete DNA profile could be derived from the samples, and the partial profiles showed only that, of all of the numerous possible matches, Appellant could not be excluded as a source. However, counsel also observed that Appellant's brother, Martin, could also not be excluded as a source, nor could any of their siblings. Counsel further commented upon the fact that the Chmiels matched only one of the many possible profiles detected, and quoted the laboratory report

stating that no meaningful database searches could be performed on the complex mixtures observed. N.T. Trial, 8/19/02, at 129–30.

At trial, the Commonwealth called to testify one of the laboratory's testing scientists, Kimberlyn Nelson, Ph.D. Dr. Nelson received her doctorate from Harvard University, taught human genetics at Penn State University, and had testified in numerous jurisdictions as a mitochondrial DNA expert. She first explained that **nuclear** DNA is different for each individual (except in the case of identical twins) because half of such DNA comes from the mother and the other half comes from the father. **Mitochondrial** DNA, by contrast, is inherited only from the mother, meaning that all persons having the same maternal relative will have common mitochondrial DNA. When there is a matching profile with mitochondrial DNA, the result is that the person whose mitochondrial DNA matches the profile cannot be excluded as a contributor of the subject DNA. However, it cannot be scientifically established through such testing that the tested sample came from any specific individual. N.T. Trial, 8/29/02, at 151–57.

Dr. Nelson then explained the process of mitochondrial DNA analysis, which ultimately includes a comparison with known DNA samples and, when possible, a statistical analysis that searches the available DNA database. A profile can range from the extremely rare to the most common profile, which occurs in six to seven percent of the individuals in the database, meaning that ninety-four percent of the population could be excluded from the most common profile. *Id.* at 157–59.

Regarding the two hair strands at issue, Dr. Nelson testified that her analysis showed that Thomas Buffton and Angelina Lunario could be excluded as possible contributors, but that Appellant and Martin could not. Five other hair strands that were tested excluded Appellant, Martin, and Buffton as possible contributors; however, Angelina Lunario and her maternal relatives could be possible contributors. *Id.* at 165–68.

Appellant's counsel subjected Dr. Nelson to vigorous cross-examination. Dr. Nelson testified on cross-examination that no database search was possible with respect to the DNA found in the two hair strands at issue because of a mixture of profiles found in those hair strands. *Id.* at 172–73. She further noted that approximately 140 mitochondrial DNA profiles were detected in these two hair strands following testing.[23] *Id.* at 173. Central to Appellant's current argument, and prompted by Appellant's counsel's leading question, Dr. Nelson testified that 140 profiles could theoretically mean that one could not exclude 140 people as possible contributors to the DNA profiles. *Id.* at 174–75. Again, however, Dr. Nelson testified that the mitochondrial DNA testing could not identify Appellant as the contributor; rather, the testing could only exclude or include Appellant. *Id.* at 177–78.

During closing arguments, Appellant's counsel first attacked the weight of Dr. Nelson's testimony, noting that the profile that included the Chmiel siblings was, as Dr. Nelson had testified, only one of many possible profiles. Further, Appellant's counsel, commenting on the fact that there were 140 recognizable profiles detected from the testing of the two hair strands, correctly argued that one profile could mean entire families, so that the total number of potential contributors to the DNA could be in the thousands. Alternatively, Appellant's counsel asserted that Dr. Nelson's testimony supported the defense theory that the actual murderer was Martin because **he** could not be excluded as a contributor of the two relevant hair strands. Counsel stated: "We have submitted to you right along that when it comes to that choice, we submit the finger points to Martin Chmiel, not [Appellant]." N.T. Trial, 9/6/02, at 79–81.

In response, the Commonwealth argued the following:
Now, that brings us to Dr. Nelson. And lo and behold[,] Dr. Nelson takes those two hairs, and as she explained to you, those two hairs, and as she explained to you, those two

23. Of the two hair strands, one was tested once and the second was tested twice. One test yielded four profiles, the second approximately six profiles, and the third 128 profiles. N.T. Trial, 8/29/02, at 160, 174.

hairs end up as three samples. . . . Those two hairs, one had four possible contributors, one had six possible contributors, one had 128 possible contributors. . . . But every time, every time those two hairs, no matter how many contributors are possible—four, six[,] or 128—every time[,] who is one of them? That [Appellant]. Now, of course, the same with [Martin] because it's the same thing. But corroboration. George Surma says these two hairs here, [Appellant].

Dr. Nelson: these two hairs here, [Appellant] or any of his brothers or sisters. Corroboration.

*Id.* at 176–77.

 In his current PCRA argument, Appellant claims that trial counsel were ineffective for failing to (1) seek the exclusion of Dr. Nelson's testimony pursuant to *Frye;* (2) consult with an independent DNA expert regarding Dr. Nelson's anticipated testimony; (3) object to Dr. Nelson's testimony with respect to the possibility that 140 profiles were the equivalent of 140 persons; and (4) object to the prosecutor's characterization of Dr. Nelson's testimony during closing arguments. Again, Appellant asserts appellate counsel were ineffective for their failure to explore and timely raise these ineffectiveness claims.

In support of his claims, Appellant presented the PCRA testimony of Laurence D. Mueller, Ph.D., a professor at the University of California, Irvine, who has taught classes in genetics and statistics. Appellant here emphasizes certain aspects of Dr. Mueller's testimony. First, Dr. Mueller testified that it was generally accepted within the scientific community that, as with samples tested by Dr. Nelson, when a scientist discovers a mixture of profiles, the results should be reported as inconclusive. Further, in contrast to Dr. Nelson's testimony, Dr. Mueller testified that mitochondrial DNA test results should be accompanied by statistics showing the likelihood of a random match to someone in the general population, relying on a 1992 scientific report. Dr. Mueller opined that it was possible to conduct a valid statistical analysis when dealing with a mixture of profiles, in contrast to Dr. Nelson's differing testimony on this subject. Using statistical analysis,

Dr. Mueller determined that the mixed profiles for one of the two hair strands at issue, for example, could be found in one in six Caucasians, one in fifty-nine African–Americans, and one in thirty-eight Hispanics. Dr. Mueller attacked as inaccurate Dr. Nelson's purported testimony that 140 profiles represented 140 individuals, and opined that including Appellant's profile in the results from the two hair strands was also inaccurate. Appellant's Brief at 89.

The Commonwealth presented rebuttal PCRA testimony from Terry Melton, Ph.D., a colleague of Dr. Nelson and the director of the laboratory where the mitochondrial DNA testing had occurred, and the co-author with Dr. Nelson of the laboratory's report. Dr. Melton reaffirmed Dr. Nelson's reasons why no statistical analysis was performed on the mixed profile results, noting that evidence of an inclusion within a profile without an accompanying statistical analysis was actually the more conservative approach and one less incriminating to a defendant. N.T. PCRA Hearing, 2/3/09 p.m., at 8–10, 56. She admitted, however, that Dr. Nelson's purported statement that 140 profiles coincided with 140 individuals was inaccurate. *Id.* at 31. As the PCRA court noted, however, Dr. Nelson had placed such purported false statement into context with her testimony that the number of DNA profiles gleaned from the two hair strands was not actually 140, but closer to 20. *Id.* at 49–51; PCRA Court Opinion at 89.

The PCRA court denied Appellant's *Frye* challenge on several grounds.[24] The court noted that Dr. Mueller had testified that he was **not** criticizing Dr. Nelson's **methodology,** only her results. PCRA Court Opinion at 90 (quoting N.T. PCRA Hearing, 12/16/08, at 64). Additionally, without clearly so stating, the PCRA court appeared to give Dr. Mueller's other testimony little credence or credibility. This is because Dr. Mueller, who has apparently frequently been used as an expert DNA witness for the defense in several jurisdictions over the years, has been an unsuccessful witness for *Frye*

24. Once again, a *Frye* challenge is directed at prohibiting "novel" and unreliable scientific evidence. *Dengler,* 890 A.2d at 380–81; *see also* discussion at Issue 4, *supra.*

challenges because courts have determined that he actually represents a minority point of view within the scientific community regarding DNA analysis, perhaps even a solitary point of view. *Id.* at 84–86. This criticism included at least one determination that the 1992 study invoked by Dr. Mueller in his instant PCRA testimony is no longer accepted within the scientific community. *Id.* at 86.[25]

The PCRA court also heavily relied on this Court's decision in *Crews*, 640 A.2d at 399–403. In *Crews*, we rejected a *Frye* challenge, similar to that now made by Appellant, regarding nuclear DNA evidence, but not mitochondrial DNA evidence. As the PCRA court noted, we relevantly held:

Appellant objects to presentation of the physical portion of the analysis without a statistical analysis to sharpen the focus of the evidence, arguing that the physical test results are meaningless without statistical conclusions. We disagree. Admissibility depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact. The factual evidence of the physical testing of the DNA samples and the matching alleles, even without statistical conclusions, tended to make appellant's presence more likely than it would have been without the evidence, and was therefore relevant. To be relevant, evidence need not be conclusive. Asked to evaluate the meaningfulness of evidence of a DNA match without an accompanying statement of statistical probability, appellant's DNA expert likened such testimony to testimony that "I saw a blue Chevrolet run over this dog." Identifying the car as a blue Chevrolet does not specifically identify the offending car, but it is

25. By contrast, the PCRA court appears to have accepted Dr. Melton's testimony as credible. After noting the criticisms by other jurisdictions of Dr. Mueller's scientific opinions and **immediately after** summarizing Dr. Melton's testimony that largely contradicted Dr. Mueller's, the court stated: "**Based upon the foregoing,** [Appellant] has not established that his trial attorneys were constitutionally ineffective in connection with the mitochondrial DNA evidence." PCRA Court Opinion at 89.

useful, admissible identification evidence. **In the same way, the relevant, though inconclusive, DNA evidence was admissible in this case; its weight and persuasiveness were properly matters for the jury to determine.**

*Crews, supra* at 402–03 (internal citations and some quotation marks omitted; emphasis added).

Based on our holding, the PCRA court here determined that "the only appellate authority in this Commonwealth addressing the admissibility of DNA evidence without statistical analysis has held that such statistical proof is unnecessary." PCRA Court Opinion at 89 (citing *Crews, supra* at 402–03). The court further noted that "[t]he governing standard for admission [into evidence] is relevancy," and because the mitochondrial DNA evidence in this case made an issue of fact more or less probable or supported a reasonable inference regarding the existence of a material fact, the mitochondrial DNA evidence was relevant and admissible pursuant to *Frye*. *Id.* Accordingly, the court concluded that trial counsel was not ineffective for failing to raise a *Frye* challenge. *Id.*

Regarding Appellant's next claim that trial counsel was ineffective for having failed to retain an independent DNA expert at trial to rebut Dr. Nelson's trial testimony, the court concluded that had Appellant requested additional funds to hire such a witness, the trial judge (who was also the PCRA judge) would have denied Appellant's request. First, the court noted that at his request, Appellant had been furnished with public funds for DNA testing of the hair strands. Second, Appellant had agreed to have the testing conducted by Dr. Nelson and her laboratory. Third, Appellant has never argued that trial counsel was ineffective for retaining this laboratory. Fourth, "the credible evidence established [at the PCRA hearing] by [Appellant's lead] trial counsel," showed that trial counsel actually **did** consult with another DNA expert in preparing for cross-examination of Dr. Nelson. *Id.* at 90–91.

Regarding Appellant's claim that trial counsel was ineffective for having failed to object to Dr. Nelson's testimony

that 140 profiles were possibly the equivalent of 140 persons, the PCRA court observed that Appellant has not established any prejudice resulting from this testimony. The court noted that trial counsel accurately stated during closing argument that Dr. Nelson's references to 140 profiles meant that thousands of people could be included within these profiles. Even in the absence of Dr. Nelson's reference, it is unlikely that the verdict would have been different given the abundance of other incriminating evidence, particularly Appellant's own testimony. *Id.* at 91–92.

Finally, regarding Appellant's claim that trial counsel was ineffective for having failed to object to purported prosecutorial misconduct during the Commonwealth's closing remarks involving Dr. Nelson's testimony, the PCRA court determined that Appellant had failed to carry his burden of proving that the prosecutor's remarks had the unavoidable effect of forming a fixed bias or hostility against him. The court based its conclusion on both Appellant's own strong advocacy during opening and closing arguments on the issue of the DNA evidence and the trial court's cautionary instructions regarding the fact that opening and closing arguments are not evidence. *Id.* at 92–93.

In his present argument, Appellant criticizes the PCRA court's determinations in several aspects, none of which we find persuasive. Appellant contends that, despite Dr. Mueller's statement that he was not criticizing Dr. Nelson's methodology, the sum of his testimony regarding Dr. Nelson's failure to apply a statistical analysis was, in fact, a criticism of Dr. Nelson's methodology. Appellant appears to assert that the PCRA court was obligated to accept Dr. Mueller's testimony as a credible alternative to Dr. Nelson's approach, and in a footnote, wholly unsupported by authority, Appellant asserts that the PCRA court should not have considered the criticism and rejection of Dr. Mueller's testimony by other courts. Appellant's Brief at 97 n. 30. Additionally, without even attempting to address the full holding of *Crews, supra,* that the PCRA court quoted and relied upon, Appellant asserts that *Crews* is inapplicable because of the distinctions between

nuclear and mitochondrial DNA, based, again, on Dr. Mueller's emphasis on the need to apply a statistical analysis. Again, Appellant ignores the fact that the PCRA court apparently found Dr. Mueller's testimony on this point less than persuasive.

Regarding the issue of whether Appellant's trial counsel should have consulted an independent expert in order to rebut Dr. Nelson's testimony, Appellant asserts that the PCRA court should not have relied upon the "hazy [PCRA hearing] recollection" of trial counsel Ackourey in making this finding. Rather, Appellant asserts that the PCRA court should have relied upon trial counsel Grealish's PCRA hearing testimony, which was definite that **he** did not consult with an independent expert and had no strategic or tactical basis for failing to do so. Appellant's Brief at 98. Appellant cites to no authority to support what amounts to be an argument that the PCRA court was obligated to make a positive credibility finding based on evidence of Appellant's choosing. Further, Appellant generally fails to cite to any authority regarding any aspect of this issue, and fails to make any developed argument that would support his significant burden on this issue. *See Wayne*, 720 A.2d at 470–71 ("The mere failure to obtain an expert rebuttal witness is not ineffectiveness. Appellant must demonstrate that an expert witness was available who would have offered testimony designed to advance appellant's cause."); *see also Marinelli*, 810 A.2d at 1269 (quoting *Commonwealth v. Copenhefer*, 553 Pa. 285, 719 A.2d 242, 253 (1998)) ("Trial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony.").

Regarding the issue of whether trial counsel was ineffective for not objecting to Dr. Nelson responding to counsel's leading question in the manner suggested by counsel's question, Appellant essentially makes inflated claims regarding the critical nature of Dr. Nelson's statement and resulting prejudice. Appellant's Brief at 99. Appellant dismisses the PCRA court's conclusions regarding lack of prejudice based on trial

counsel's advocacy during closing remarks, noting that such remarks are not evidence. *Id.*

Finally, Appellant dismisses the PCRA court's conclusions regarding trial counsel's failure to object to the prosecutor's closing statements concerning Dr. Nelson's testimony. Appellant simply asserts that "[t]here is no question that" the prosecutor's "comments were improper and prejudicial to Appellant." *Id.* Appellant bases this extraordinary assertion on testimony by Dr. Mueller that the PCRA court had clearly rejected. Our review of the prosecutor's comments shows no impropriety. Moreover, in summarizing his general argument on this issue, unencumbered by direct authority supporting his claims, Appellant states: "Clearly there was no downside to making ... an objection." *Id.* at 94. We must remind Appellant, at this juncture, that an absence of a "downside" for counsel taking any particular action has never been recognized as a basis for obtaining PCRA relief under 42 Pa.C.S. § 9543(a).

▮ The ruling of the PCRA court on Issue 6 is supported by the record and free of legal error; thus, we reject Appellant's contentions, which we conclude are wholly meritless. *See Washington*, 927 A.2d at 593 (stating that our standard of review for an appeal from the denial of PCRA relief requires that we determine whether the ruling of the PCRA court is supported by the record and is free of legal error). Additionally, we observe that completely absent from Appellant's argument on this issue is a recognition of **his trial strategy** to implicate his brother, Martin, as the murderer, when Appellant was allegedly elsewhere at the time. This was a plainly reasonable strategy given that Martin had conveyed to the police details of the murders that only the murderer, or someone at the scene, would know. The DNA evidence, which Appellant here attacks in this PCRA claim, showed that **Martin** could not be excluded as a source of the two relevant hair strands found on the sweater sleeve, and thus actually supported counsel's trial strategy. "[W]e do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether

counsel's decisions had any reasonable basis. We will conclude that counsel's chosen strategy lacked a reasonable basis only if Appellant proves that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Paddy*, 15 A.3d at 442 (citations and quotation marks omitted).

In sum, Appellant cannot satisfy either the arguable merit prong or the reasonable basis prong of the *Pierce* test for ineffective assistance of trial counsel. Because trial counsel were not ineffective, Appellant's derivative claims of appellate counsel ineffectiveness also must fail.

## PENALTY PHASE CLAIMS

**7. Did trial counsel render ineffective assistance by failing to adequately investigate and prepare for Appellant's capital sentencing hearing?**

Appellant alleges that trial counsel were ineffective in failing to investigate, develop, and present additional mitigating evidence during the penalty phase, and that post-sentence and appellate counsel were ineffective in failing to investigate and pursue this claim. Specifically, Appellant contends that, because of counsel's ineffectiveness, the jury did not hear "complete" evidence of the following: (1) the pervasive and extensive physical and sexual abuse to which Appellant had been subjected, as well as his family history of dysfunction and impairment; (2) the fact that Appellant had met all but one criteria for post-traumatic stress disorder ("PTSD") at the time he committed the murders, and would have met this criterion if not for his alcohol abuse; (3) the relationship connecting Appellant's childhood PTSD, his alcohol dependence and abuse, and his "almost" PTSD as an adult; and (4) the possibility that Appellant had met the statutory mitigating factor of extreme mental or emotional disturbance, set forth at 42 Pa.C.S. § 9711(e)(2). Appellant alleges that counsel's investigation and presentation of the above mitigating circumstances were deficient and that he was therefore deprived of his Sixth Amendment right to counsel.

We have described the principles regarding counsel's duty to investigate evidence of a defendant's mitigating circumstances as follows:

It is well established that capital defense counsel has a duty to undertake reasonable investigations or to make reasonable decisions that render particular investigations unnecessary. In the context of the penalty phase, trial counsel has an obligation to conduct a thorough investigation of the defendant's background, particularly with respect to the preparation and presentation of mitigation evidence. [T]his obligation includes the duty of penalty phase counsel to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor. The reasonableness of a particular investigation depends upon evidence known to counsel, as well as evidence that would cause a reasonable attorney to conduct a further investigation. At the same time, counsel's obligations do not require an investigation into every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.

*Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1225 (2006) (*"Spotz V"*) (internal quotation marks and citations omitted).

In addition, we have made clear the following:

The reasonableness of counsel's investigation and preparation for the penalty phase, of course, often depends critically upon the information supplied by the defendant. Counsel cannot be found ineffective for failing to introduce information uniquely within the knowledge of the defendant and his family [that] is not provided to counsel.

*Commonwealth v. Bond*, 572 Pa. 588, 819 A.2d 33, 45–46 (2002) (internal citations omitted); *see also Commonwealth v. Bracey*, 568 Pa. 264, 795 A.2d 935, 944 (2001) (concluding that counsel could not be found ineffective for failing to present evidence of the appellant's history of abuse where appellant and his family failed to reveal such history during their consultations with counsel). In this regard, we have been

careful to note that "different light falls upon counsel's performance depending upon whether [counsel] asked and was not told, or [alternatively, whether counsel] did not ask and therefore was not told." *Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 735 (2000).

With respect to judicial review of claims asserting that trial counsel failed to investigate adequately matters important to the defense, and thereby was ineffective, we have observed:

Strategic choices made following less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitation of the investigation. In undertaking the necessary assessment, reviewing courts are to take all reasonable efforts to avoid the distorting effects of hindsight. Nevertheless, courts must also avoid *post hoc* rationalization of counsel's conduct.

*Commonwealth v. Sattazahn*, 597 Pa. 648, 952 A.2d 640, 655–56 (2008) (citations omitted).

Finally, but of significance to Appellant's instant claims, "[t]his Court has consistently held that trial counsel cannot be deemed ineffective for failing to present mitigating evidence that merely would have been cumulative of evidence that was presented during a penalty hearing." *Commonwealth v. Miller*, 605 Pa. 1, 987 A.2d 638, 667 (2009); *see also Spotz V, supra* at 1231, 1232.

■ At his penalty hearing, Appellant presented the testimony of his brother, Felix;[26] the county prison chaplain, the county prison warden, and a board-certified psychiatrist and forensic psychiatrist, John C. Ouligian, M.D. Felix and Dr. Ouligian focused their testimony on Appellant's childhood. Felix was the oldest of Appellant's ten siblings, and, at the time of the penalty hearing, was 54 years old, and had been employed by the Department of Defense for 35 years. Additionally, he had served 22 years in the military. As the PCRA court noted with respect to Felix's testimony, Felix:

**26.** Felix is also occasionally referred to in the trial or PCRA hearing notes of testimony as "Victor" or "Vic."

provided a compelling account of his father's alcoholism, waste of family resources on alcohol, and physical and mental abuse of [the father's] wife and children. [Felix's] testimony included specific instances with reference to [Appellant], such as the . . . incidents involving the "pee bottle" and sleeping nude on the couch with [Appellant].[27] Felix . . . furnished additional details [from those disclosed at the 1995 trial] as to how the children were forced to "scrounge for cigarette butts" at the neighborhood church, to "bring food from the garbage cans" at local restaurants and to search for "scrap iron" in the Lackawanna River to sell in a junkyard. He also attested that if the Chmiel children earned any money from odd jobs, their father would "beat it off" them and spend it on alcohol.

[Defense counsel] specifically questioned Felix [ ] concerning any possible sexual abuse in the Chmiel home. In response, [Felix] stated that the Chmiel family had "a father who would walk around naked in front of his sons and daughters and his wife and make [Appellant] lay on the coach with him[. ]I can't say he physically had sex with him, but that's physical and sexual abuse, yes." Felix [ ] did not identify any other alleged sexual abuse by his father in reply to that direct inquiry.

PCRA Court Opinion at 24–25 (citations to trial N.T. Trial, 9/9/02, omitted).

Additionally, Felix testified that the father, whom he described as spending "his days at home kicking the heck out of us," reserved especially bad treatment for Appellant. N.T. Trial, 9/9/02, at 41–42. Felix testified that in addition to forcing Appellant to lie with him on the couch, sometimes

---

27. Felix provided mitigating testimony at Appellant's 1995 trial that was similar to his testimony at the 2002 trial. In both penalty phase hearings, Felix explained that his father was loathe to move from the family couch to attend to his need to eliminate urine. He therefore had at hand what was referred to as a "pee bottle" into which he urinated. He would sometimes empty the contents of the "pee bottle" on Appellant's head as a form of punishment. Moreover, the father would also sometimes sleep on the couch while naked and force Appellant to join him there, also using Appellant as a personal slave by having him hold the "pee bottle" during urination or by sending him to fetch snacks or other items. The father was deceased by the date of the murders.

overnight, the father would send Appellant to where sewage pipes spilled into the Lackawanna River to dig through human waste in search of nickels and dimes. Felix explained that their father was convinced that money had been inadvertently flushed down the toilet by inattentive men who lost their change into the bowl while taking their pants down or pulling them up. *Id.* at 42. Felix gave evidence that the phenomenon of losing change into the sewage system could not occur in the Chmiel household since it contained no working toilets, in part because the father would not pay utility bills. *Id.* at 43. Felix acknowledged that the family received public assistance, but testified that all welfare checks were spent by the father at the local Carbondale bars. *Id.* at 49. Additionally, Felix described the daily violence in the house from the hands of their father, who would also regularly beat their mother in Appellant's presence. *Id.* at 44.

Dr. Ouligian first testified regarding his then-current credentials as a physician. He was board-certified in psychiatry and forensic psychiatry by the American Board of Psychiatry and licensed to practice psychiatry in three, and at one time four, states. He further testified that he was a clinical professor of psychiatry at the University of Pennsylvania, and has provided psychiatric consultant services for the Philadelphia Correctional facility and the Colorado Department of Corrections. Dr. Ouligian based his trial testimony on his two-hour-and-forty-five minute interview and evaluation of Appellant, his review of 1983 and 1984 psychiatric evaluations of Appellant, Felix's 1995 penalty phase testimony (which, as noted, was substantially similar to his 2002 penalty phase testimony), and some discovery and prison records.

Dr. Ouligian testified quite extensively regarding Appellant's family history as relayed to the doctor by Appellant. Dr. Ouligian testified that Appellant at first downplayed the barbarity of his father's behavior, stating that his father had done some good things, but also acknowledging that his father would "beat the hell out of all of us whenever he was drunk and sometimes when he wasn't drunk." *Id.* at 62. However, during the course of the interview, Appellant volunteered more information about his childhood conditions. Dr. Ouligian

recounted to the jury that information as follows, which is quoted at some length in order to frame correctly Appellant's current ineffectiveness-of-counsel argument:

[Appellant] said he was beaten by his father when he came home drunk. He said it maybe didn't happen every day but whenever [the father] had money[,] he'd come home drunk. . . . [H]e said it wasn't just him. It was his ten brothers and sisters that also got beat. [Appellant's] mom got beat, too. [Appellant] himself didn't remember getting singled out; but if he got beat, it was because he just happened to be there. He didn't recall his father hitting his sisters[,] but his sisters later on told him that they got hit also.

[Appellant] described the piss bottle that was described by his brother. He said his father used his children as slaves to hold the piss bottle, light his cigarettes, and get his beers for him. He said his father would sleep naked on the sofa and on [the] mother's bedroom floor, whenever he came home drunk[,] and [Appellant] would have to sleep naked with him. He did not remember being sexually abused[,] and by that he meant he didn't remember his father fondling him or performing sexual acts on him[,] nor did he remember any of his sisters sleeping with his father[,] but he was unsure of that.[28] . . . .

[Appellant] said [that] his father regularly beat his mother. He said that his mother was brutalized by his father. [His] mother had black eyes, broken arms. [The father], excuse me, beat the shit out of her. He put her through a wall. [Appellant would] hear [his father] tell [his] mom to do this, do that, do this, sexual things and perform fellatio on him. [Appellant] didn't use that term, but—you'd hear it through the walls and [Dr. Ouligian] asked him did she follow—did she do what she was told? And [Appellant] said yes because if she didn't, [the father] would beat her and [Appellant would] hear her suffer through the walls.

28. At this point in his testimony, Dr. Ouligian opined that forcing an eight-year-old boy to sleep naked with his father, even without any fondling or other acts, alone constitutes sexual abuse. N.T. Trial, 9/9/02, at 65.

[Appellant] said that he and his brothers or the neighbors would call the police because his parents were always fighting. He said that when the police were called because his father was beating his mother[,] that the police would take him downtown, give him a couple of bucks[,] and send him to a bar. Once in a while they would arrest him[,] but [Appellant said] his mother would then have to go downtown and pick him up when he was ready to come home. They [the children] told [Appellant's] mother to leave [the father] and they begged her to do that, but she said I can't leave him. Sometimes we [the children] spent days living in a station wagon to get away from him. . . . .

[Appellant's] father used to sleep all day and have his wife cash the welfare check. She had to give him all [of] the money. [Appellant] said there was no food in the house most of the time and [that] he and his brothers had to go to work and get food and clothing for everyone. [Appellant] said the family lived on surplus food from welfare agencies[,] but his father actually went to borrow money from the priest every week[,] and [the father] would get that money and then go out and drink with it, telling the priest that he was going to buy food for his family.

[Appellant's] mother worked as a nurse's aide under the table[,] but the father took whatever money she could not hide. If she hid all [of] the money, his father would beat her until she gave it to him. [Appellant's] first formal job was washing dishes . . . at the age [of] 12. . . . He kept any money he earned under a rock by the railroad tracks[,] because if he didn't, his father would take it from him and use it. His father had strip[-]searched him on occasion to take the money so [that] he could go out and drink. . . . He said that he hated going to school because he didn't have any clothes to wear.

He joined the Marine Corps at 17 to get out of the house.

*Id.* at 64–68.

Dr. Ouligian testified that Appellant's background may have caused him to suffer from PTSD as a child, but that Appellant

did not suffer from PTSD at the time of the doctor's evaluation of Appellant. *Id.* at 75. Moreover, Dr. Ouligian ruled out a "classic psychiatric diagnosis." *Id.* at 60. However, Dr. Ouligian opined that Appellant had a history of alcohol abuse and probably had an addiction to alcohol. *Id.* at 60, 74. Dr. Ouligian also testified regarding the impact of inebriation as a "disinhibitor" on one's ability to appreciate the criminality of one's behavior. *Id.* at 81. Dr. Ouligian opined that Appellant's alcohol consumption impaired his ability to conform to lawful behavior. *Id.* at 85.

Based on Appellant's penalty phase evidence, the jury found that Appellant had proven the following mitigating factors: (1) Appellant had no significant history of prior criminal convictions, 42 Pa.C.S. § 9711(e)(1); and (2) other evidence of mitigation arising from family relationships and an abusive upbringing, 42 Pa.C.S. § 9711(e)(8).

Despite the success of trial counsel in proving these mitigating factors, and presenting the graphic testimony upon which the second mitigating factor was based, Appellant now argues that trial counsel had failed to adequately investigate and prepare for the penalty hearing and "presented an incomplete and cursory account of Appellant's upbringing and his resultant mental disorders." Appellant's Brief at 7. This argument takes several tracks.

First, Appellant asserts that the PCRA hearing testimony of his trial counsel, Paul Ackourey, Esq., revealed that counsel purportedly spent only 10.9 hours preparing for the penalty phase of trial, as evidenced by trial counsel's time sheets. Appellant also asserts that trial counsel's investigator failed to interview any of Appellant's family members regarding penalty phase matters. Additionally, Appellant cites to his trial counsel's PCRA hearing testimony that trial counsel purportedly could not recall speaking to Appellant's family members regarding penalty phase issues, and that, purportedly, trial counsel spent twelve minutes only over the telephone in preparing Felix for his testimony. Finally, Appellant highlights the PCRA hearing testimony of Appellant's siblings,

Nancy and Joseph, that trial counsel had failed to meet with them. *Id.* at 9–11.

Appellant's contentions are contradicted and refuted by the PCRA hearing record and the PCRA court's related factual findings. First, Appellant's trial counsel stressed repeatedly that he is not the "best timekeeper" and that his time sheets do not reflect the work counsel actually devoted to the case. *See, e.g.,* N.T. PCRA Hearing, 8/12/08, at 166; *see also* N.T. PCRA Hearing, 12/16/08, at 78 (wherein trial counsel, referring to the fact that his time sheet reflecting twelve minutes or less of conversations with Felix (referred to in the transcript as "Victor") prior to the penalty hearing, states: "I didn't add it up. If that's what it adds up to."), and at 82–83. Second, as the PCRA court determined to be pertinent, trial counsel had a historic knowledge of both the guilt and penalty phase issues because he had served as Appellant's appellate counsel after the first trial, had won a second trial for Appellant, and had served as trial counsel at the second (1995) trial as well as the third. *See, e.g.,* N.T. PCRA Hearing, 8/12/08, at 114, 119–20; *see also* PCRA Court Opinion at 21, 31, and 35.

Third, trial counsel testified that during the course of the two trials, he had met repeatedly with Appellant's family members. *See, e.g.,* N.T. PCRA Hearing, 8/12/08, at 91–92, 128, 130–33; N.T. PCRA Hearing, 12/16/08, at 83. The PCRA court specifically found this testimony to be credible. PCRA Court Opinion at 30. As the PCRA court determined:

Attorney Ackourey testified credibly that he had "a lot of contact" with [Appellant's] family in advance of the third trial and made strategic decisions as to which family members would be called as mitigation witnesses. According to Attorney Ackourey, Felix Chmiel was more forthcoming about the Chmiel's children's abusive upbringing whereas the other family members, particularly [Appellant's] sisters were "much less willing" to discuss it. Since Felix Chmiel was a better witness than [Appellant's] other siblings, trial counsel presented his testimony during the penalty phase even though [Appellant] was reluctant to present any evidence concerning his childhood.

*Id.* at 31–32 (quoting Appellant's trial counsel; citations to PCRA hearing and footnote omitted).

Appellant's allegations that the record does not support the PCRA court's findings are based in significant part on the fact that trial counsel testified during the 2008 PCRA hearing that he had no recollection of **specific** meetings with family members occurring six years earlier, prior to the 2002 trial. Appellant's Brief at 10 (citing N.T. PCRA Hearing, 8/12/08, at 132; N.T. PCRA Hearing, 12/16/08, at 83–84). However, as is clear from the transcript of the PCRA hearing, trial counsel's lack of recollection regarding the **specifics** of his meetings with family members for penalty phase issues is not contradictory to his testimony, found credible by the PCRA court, that he actually had conducted such meetings. *See* N.T. PCRA Hearing, 8/12/08, at 90–93, 118–19, 130–33, 155, 167; N.T. PCRA Hearing, 12/16/08, at 83–84.

We note that the PCRA court also found credible trial counsel's direct refutation of the allegation made by Felix at the PCRA hearing that trial counsel had never arranged for Felix to testify as a mitigation witness, but called upon Felix to testify only after accidentally coming upon him at the courthouse. Trial counsel asserted that Felix's allegations were "absolutely preposterous." N.T. PCRA Hearing, 8/12/08, at 129. The PCRA court found Felix's testimony on this matter to be "wholly incredulous [sic]." PCRA Court Opinion at 28 n. 17.

Thus, Appellant's **general** allegations that trial counsel had inadequately prepared for the penalty hearing are not supported by the record and the PCRA court's factual findings, which contradict and defeat Appellant's PCRA hearing evidence to the contrary. However, Appellant advances another prong of his argument based on the PCRA hearing testimony of several of Appellant's siblings, including Felix. In this prong of his argument, Appellant contends that if trial counsel had investigated penalty phase issues more deeply, counsel would have been able to present an even more compelling picture of Appellant's horrendous childhood. In support

of this argument, Appellant highlights the PCRA testimony of Appellant's siblings, Felix, Robert Chmiel, and Nancy Moran.

However, on review, we conclude that this testimony is either cumulative of the testimony actually provided during the penalty phase of Appellant's trial, or it sets forth particular acts of brutality directed at Appellant's siblings without any corresponding connection to Appellant's witnessing or experiencing in some manner these particular acts.

Felix's PCRA testimony added details to his trial testimony regarding his father's acts of brutality and included new information that the father had sexually molested Felix and one of their sisters. Felix acknowledged that Appellant's trial counsel had questioned him regarding the father's treatment of Appellant and his siblings and the father's sexual abuse. However, Felix contended that trial counsel's questions were inadequate in terms of his being able to depict fully what had occurred in the Chmiel household. N.T. PCRA Hearing, 8/12/08, at 92–93. The PCRA court rejected assertions that Felix's PCRA testimony established that he would have provided trial testimony of greater impact but for trial counsel's alleged deficiency, noting that the only new claim raised by Felix involved the assertion that the father had forced Felix to perform oral sex upon him and that the father had molested one of his daughters. PCRA Court Opinion at 28. The PCRA court noted that trial counsel at the penalty phase of trial had directly asked Felix whether the father had committed sexual abuse against his children, as acknowledged by Felix during the PCRA hearing. *Id.* However, Felix was not forthcoming with the information he later attested to at the PCRA hearing.

We agree with the PCRA court that Appellant's arguments regarding Felix's PCRA hearing testimony do not support an ineffectiveness claim. First, Appellant's brief does not explain how trial counsel's questioning of Felix at the penalty phase of trial was deficient, but rather attempts to establish incompetence by asserting that trial counsel devoted inadequate time to the penalty phase generally and to his preparation of Felix's testimony. Those assertions were properly rejected by

the PCRA court based on clear evidence of record, and the PCRA court's determination that Felix's PCRA testimony was not credible. *See* PCRA Court Opinion at 28 n. 17.

Second, there is nothing in the trial record supporting the claim that Felix lacked the opportunity at the penalty phase to provide additional details or a full account of his father's sexual abuse. *See* N.T. Trial, 9/9/02, at 40–50. Indeed, it would appear that trial counsel's exploration during the penalty phase of trial of the pertinent areas of physical, psychological, and sexual abuse involving Appellant were both broadly canvassed and dealt with in important detail. *Id.* As the PCRA court determined, Felix's penalty phase testimony was indeed compelling and, aside from the new claim of sexual assault by the father on Felix and one of the sisters, such testimony would not have been substantially enhanced by the additional details attested to by Felix at the PCRA hearing. Moreover, Felix had testified at **two** of Appellant's penalty hearings (1995 and 2002) without offering any of the additional details he testified to at the PCRA hearing. Thus, it cannot be asserted that in 2002, Felix was not prepared fully to testify to all relevant details of the family upbringing.

Robert Chmiel's PCRA testimony raised no new claims of abuse, aside from claiming to have seen his sister, Theresa, sobbing while tied to a chair, but his testimony was essentially cumulative of that given by Felix and Dr. Ouligian at the penalty phase of trial. Appellant even appears to concede as much in his brief, stating:

[Robert] **too**[ ] told the PCRA court about the pervasive violence he and his siblings endured at the hands of their father, he confirmed the earlier testimony about the pee bottle, and painted a picture of abject poverty and lack of basic necessities, an alcoholic father, and the fact that [Appellant] often took the brunt of their father's sadistic wrath.

Appellant's Brief at 20 (emphasis added).

▌ Trial counsel is not ineffective for failing to present mitigating evidence that would have been merely cumulative

of evidence that was presented during a penalty hearing. *Miller, supra* at 667; *Spotz V, supra* at 1231, 1232.[29]

Nancy Chmiel Moran testified regarding, first, the squalid and penurious physical conditions of the children's upbringing, including the lack of water, food, heat, toothpaste, clothes, and sanitary conditions, and the corresponding abundance of cockroaches and bed bugs in the household. She also testified regarding the father's physical abuse and her witnessing her sister, Theresa, tied to a chair by a bed sheet that was also draped over her. She also testified that she heard her mother being sexually assaulted by her father. Although Nancy met with Appellant's trial counsel regarding the testimony she would give (and then did give) at the guilt phase of trial, she testified at the PCRA hearing that she was not asked to give penalty phase testimony nor did she ask to give such testimony. Although she was cognizant that this was her brother's third trial, she did not provide to Appellant's counsel the information that she offered at the PCRA hearing. *See* N.T. PCRA Hearing, 8/12/08, at 15–16.[30] Nancy had also testified during the guilt phase of Appellant's second trial. *Id.* at 29–30.

Again, Nancy's PCRA testimony fails to serve as a basis for Appellant's ineffectiveness claim for reasons similar to the inadequacy of the PCRA testimony of her siblings. Her testimony is either cumulative of the testimony given by Felix and Appellant, through Dr. Ouligian, at the penalty phase (*see Miller, supra* at 667; *Spotz V, supra* at 1231, 1232), or it involved matters not linked to anything Appellant had witnessed. Although Robert and Nancy testified to seeing their sister, Theresa tied to a chair, with the implication that she had been sexually abused by their father, there was no

29. Robert was scheduled by trial counsel to testify at the penalty phase of trial. The alleged circumstances of Robert's failure to testify are discussed in Issue 11.

30. As described more fully in Issue 2, *supra,* at the time of the murders, Nancy was married to Thomas Buffton, who along with Martin Chmiel, was arrested for the arson fire of the Buffton house in 1983. Nancy admitted at the PCRA hearing that she was involved in the arson, but was never arrested. *See* N.T. PCRA Hearing, 8/12/08, at 17–29.

testimony that Appellant had actually witnessed this incident or even had knowledge of it. Dr. Ouligian testified at the penalty phase of trial that Appellant "didn't recall his father hitting his sisters but his sisters later on told him that they got hit also." N.T. Trial, 9/9/02, at 64.

At the penalty phase of trial, Appellant's trial counsel presented a vivid picture of Appellant's brutal, penurious, and dysfunctional family environment, in which his abusive father deliberately deprived his children of life's basic necessities and the love and emotional support that children need. In the testimony provided through Appellant's trial counsel, a home atmosphere of near constant neglect, violence, and astonishing abuse was apparent. More importantly, the jury **found** the existence of the mitigating circumstance that Appellant had **proven** with evidence that he now asserts was inadequate.

Despite the extensive evidence provided at the penalty phase that proved the mitigating factor for which it was offered, Appellant argues that had his counsel presented even further details and more examples of abuse, of whatever nature, it is likely that the jury would have attributed determinative weight to mitigating circumstances and not imposed the death penalty. We agree with the PCRA court that this argument is unconvincing and ultimately unavailing. Appellant labors under the mistaken notion that if only the jury had more details and more data regarding his upbringing, it would not have returned a death sentence. However, the PCRA evidence upon which Appellant relies is either cumulative or not linked to Appellant's knowledge or participation.

In addition, trial counsel cannot be held ineffective for failing to uncover details and instances of abuse that Appellant and his family failed to disclose. *See Bond, supra* at 45–46. In this regard, it is critical to note that Appellant has had three trials, during at least two of which the family members who testified at the PCRA hearing had testified and participated. That they now come forward with additional, previously undisclosed evidence concerning a trial strategy used at all three trials, is a circumstance unrelated to any potential fault

of trial counsel. Accordingly, Appellant's allegations of penalty phase counsel's ineffectiveness for failing to investigate and present sufficient evidence of abuse and family dysfunction and impairment have no merit, failing to satisfy the first *Pierce* prong.

In the final track of his argument, Appellant asserts that the PCRA hearing testimony of Dr. Ouligian and Neil H. Blumberg, M.D., a forensic psychiatrist, establish that trial counsel failed to adequately prepare for the penalty hearing by more thoroughly exploring Appellant's mental condition. Specifically, Appellant contends that the PCRA hearing testimony of these two physicians supports the conclusion that at the time of the murders, Appellant suffered from all but one of the four criteria that establish PTSD, and that the other three criteria, on their own, can lead to "extreme mental, emotional disturbance." N.T. PCRA Hearing, 8/8/08, at 134 (testimony of Dr. Blumberg). Moreover, Dr. Blumberg opined that the reason Appellant did not meet the final criterion was because of his alcoholism, which, by its numbing effect, purportedly prevented the symptoms of that criterion from materializing. Appellant argues that trial counsel were ineffective for having failed to provide such evidence to the jury, and that appellate counsel were ineffective for failing to recognize this deficiency in trial counsel's advocacy.

Appellant also contends, based on Dr. Blumberg's PCRA hearing testimony, that Dr. Ouligian's testimony was hampered by his inability to examine Appellant's siblings with respect to their childhood upbringing, and that any psychological assessment of Appellant was limited without this additional information. Appellant asserts that had trial counsel drawn from additional testifying psychological experts the full panoply of mental disturbance that had developed within him from his childhood circumstances, including his "almost" PTSD at the time of the murders, the jury would have been able to find a mitigating factor additional to those that he had actually established. That mitigating factor would be that of extreme mental or emotional disturbance at the time of the offense. 42 Pa.C.S. § 9711(e)(2).

Finally, Appellant contends that had trial counsel adequately prepared Dr. Ouligian or had consulted other expert psychiatric witnesses, Appellant would have been able to establish that his abuse of alcohol was in actuality an alcohol dependence. A diagnosis of alcohol dependence would purportedly have provided significant support for the theory that, if not for his alcoholism, Appellant would have suffered from PTSD at the time of the murders, and would thus have provided support for the establishment of the (e)(2) mitigating factor.

The PCRA court rejected Appellant's arguments, noting that Appellant had failed to show how any of such additional information would have swayed the jury differently in its weighing of aggravating and mitigating factors when they had heard from Dr. Ouligian that Appellant was definitely impaired by alcohol abuse and probable alcohol dependence and that he had suffered from childhood PTSD. The court further held that the PCRA hearing testimony of Drs. Ouligian and Blumberg established that neither physician would have been permitted to testify that Appellant had PTSD at the time of the murders because such opinion could not be expressed within a reasonable degree of professional certainty. Moreover, the court observed that Appellant also had failed to show how a diagnosis of alcohol dependence rather than alcohol abuse would have made any difference with the jury. Indeed, the court noted that Appellant "is hard pressed to argue" that his alcoholism, of whatever variety, "impaired his ability to appreciate the criminality of his conduct" when he testified under oath at trial (and the previous trial) that he did not commit the murders. PCRA Court Opinion at 35.

We agree with the PCRA court that Appellant's claim is lacking merit. Appellant's principal contention is that trial counsel was ineffective for not presenting to the jury evidence that at the time of the murders, he had all but one of the criteria necessary to establish PTSD and that Appellant's alcohol dependence prevented him from meeting the final criterion. The fact remains, however, that Appellant did not meet the criteria for PTSD at the time of the murders. Moreover, Dr. Blumberg's PCRA hearing testimony that the factors Appellant did meet **could** lead to "extreme mental,

emotional disturbance," was stated as a general principle regarding individuals who might have such criteria.[31] Dr. Blumberg did not testify that at the time of the murders, Appellant actually suffered from an "extreme mental, emotional disturbance." Appellant's burden, however, was to show that at the time of the murders, he was impaired by such extreme, mental disturbance. At the penalty hearing, Dr. Ouligian admitted that he could not apply to Appellant a "classic psychiatric diagnosis." N.T. Trial, 9/9/02, at 60. Further, Appellant does not satisfactorily explain how Dr. Ouligian's interview of Appellant's siblings, had it happened, would have altered that diagnosis.

Trial counsel cannot be faulted for failing to present evidence that his client "almost" had a psychiatric condition at the time of the crimes, particularly in the face of evidence from counsel's own witness that there was no "classic psychiatric diagnosis." As we stated:

The reasonableness of a particular investigation depends upon evidence known to counsel, as well as evidence that would cause a reasonable attorney to conduct a further investigation. At the same time, counsel's obligations do not require an investigation into every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.

*Spotz V*, 896 A.2d at 1225 (citations and quotation marks omitted).

We recently held that expert testimony elicited at a PCRA hearing regarding a capital defendant's deliberate and repeated use of drugs and alcohol does not "offer significant support" for the mitigating factor set forth at 42 Pa.C.S. § 9711(e)(2), even in a case where the evidence showed that the defendant had consumed a significant quantity of alcohol, even to the point of possibly passing out, just prior to his killing the victim.[32] *Commonwealth v. Gibson*, 19 A.3d 512, 527 (Pa.2011). We determined:

31. N.T. PCRA Hearing, 8/8/08, at 134 (testimony of Dr. Blumberg).

32. In that case, however, there was no diagnosis by the expert testifying at the PCRA hearing of alcohol dependence. However, *Gibson* is

434

In *Commonwealth v. Saranchak,* 581 Pa. 490, 512, 866 A.2d 292, 305 (2005), . . . this Court held that a substance-abuse diagnosis and alcohol consumption on the day in question do not by themselves support the concept that the defendant was under an extreme mental or emotional disturbance at the time of the offense. Just as importantly, jurors are aware of a substantial volitional component involved in an individual's decision to use drugs and alcohol. *Cf. Montana v. Egelhoff,* 518 U.S. 37, 44, 116 S.Ct. 2013, 2018, 135 L.Ed.2d 361 (1996) (plurality) (noting that, historically, voluntary intoxication has been viewed by society as aggravating the severity of a given offense); *Hamilton v. Ganias,* 417 Mass. 666, 632 N.E.2d 407, 407–08 (1994); *Tobias v. Sports Club, Inc.,* 323 S.C. 345, 474 S.E.2d 450, 455 (1996) ("[V]oluntary intoxication is a self-indulgent act and 'a person who voluntarily consumes alcohol to the point of intoxication is at the very least partially responsible for his injuries.'" (quoting *Lyons v. Nasby,* 770 P.2d 1250, 1255 (Colo.1989))). . . . As such, and consistent with *Saranchak,* we believe that Dr. O'Brien's testimony did not adequately support the concept that a reasonable juror might have viewed [the defendant's] substance abuse diagnosis, or his voluntary alcohol and/or drug ingestion on the evening in question, as establishing the (e)(2) mitigating circumstance.

*Id.* at 527–28 (footnote omitted).

Even assuming that Appellant would have been able to establish the (e)(2) mitigating factor at the penalty hearing, we note that his present argument is notably free of any discussion of how this one additional mitigating factor would have had an impact on the jury in the face of the significant aggravating factors proven by the Commonwealth. In this respect, Appellant's argument is deficient, as he is required to **prove** actual prejudice. *Commonwealth v. Lesko,* 15 A.3d 345, 383 (Pa.2011). Thus, Appellant cannot prevail because (1) his argument that there existed evidence that he believes would

notably distinguishable from the instant case by the lack of evidence here that Appellant was under the influence of alcohol at the time of the murders. Indeed, his testimony and trial theory is that he did not commit the murders and was never even at the scene of the murders.

have proven the mitigating factor set forth at 42 Pa.C.S. § 9711(e)(2) is not well supported; and (2) even if such evidence did exist, Appellant has failed to show that the establishment of the (e)(2) mitigating factor based on such "evidence" would have had a meaningful impact on his sentence.

Finally, we agree with the PCRA court that a revised diagnosis of alcohol dependence in lieu of the diagnosis given to the jury of alcohol abuse and probable dependence is of no moment. There is no basis for the conclusion that this revision, had it occurred, would have caused the jury to weigh differently the mitigating versus aggravating circumstances. *See Commonwealth v. Spotz ("Spotz VI")*, 18 A.3d 244, 315 (Pa.2011) (holding that prejudice is not shown without establishing that a revised psychological diagnosis would have caused the jury to weigh differently the mitigating versus aggravating circumstances).

Because Appellant has not shown that trial counsel failed to adequately investigate penalty phase issues and prepare penalty phase witnesses, Appellant has failed to establish the first *Pierce* prong for ineffectiveness. Thus, Appellant has also failed to establish that appellate counsel were ineffective for having failed to raise such claims.

8. **Did the trial court's denial of individual *voir dire* of potential jurors violate Appellant's rights under the U.S. Constitution, Pennsylvania law[,] and due process, and were all prior counsel ineffective to the extent they failed to object, raise, and litigate this meritorious issue?**

Appellant asserts that he is entitled to a new penalty hearing because of the failure of trial counsel to assert constitutional and legal rights to individual *voir dire* of potential jurors. This claim pertains **not** to any venire person selected for Appellant's jury. Appellant does not assert that he was denied individual *voir dire* regarding any individual that **actually served** on the jury. Rather, Appellant's claim pertains to two groups of venire persons that the trial court dismissed for

cause prior to the empanelling of the jury. Fifteen venire persons were dismissed for cause, based on their written responses to a court-prepared questionnaire, with Appellant's trial counsels' consent or pursuant to said counsels' request. Twelve venire persons were dismissed for cause by the trial court based on their written responses to two questions on a court-prepared questionnaire, after the trial court overruled Appellant's trial counsels' objections to their being stricken without further questioning.

Appellant asserts that (1) although trial counsel objected to the dismissal without additional *voir dire* of twelve venire persons, trial counsel were ineffective for having failed to **also** assert Appellant's right to individual *voir dire* pursuant to Pa.R.Crim.P. 631(E); and (2) trial counsel were ineffective for not having lodged any objection to the dismissal of the other fifteen venire persons without additional *voir dire*. As these claims have clearly been waived for failure to assert them on direct appeal, Appellant further argues that his counsel on direct appeal were ineffective for having failed to raise arguments pertaining to these alleged deficiencies of trial counsel.

Appellant posits that underlying his claims are (1) the constitutional right to a fair and impartial jury;[33] (2) the pronouncements of the United States Supreme Court interpreting that right with respect to disqualifying potential jurors who have general objections to the death penalty or who have expressed conscientious or religious discomfort with imposing the death penalty;[34] (3) case law from this Court discussing a capital defendant's right to individual *voir dire*;[35] and (4) the right of a capital defendant to individual *voir dire* under Pa.R.Crim.P. 631(E).

33. *See Ross v. Oklahoma*, 487 U.S. 81, 85, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) ("It is well settled that the Sixth and Fourteenth Amendments [of the United States Constitution] guarantee a defendant on trial for his life the right to an impartial jury.").

34. *See Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and its progeny.

35. *See Commonwealth v. Boxley*, 575 Pa. 611, 838 A.2d 608 (2003); *Commonwealth v. DeHart*, 512 Pa. 235, 516 A.2d 656 (1986).

A capital defendant is entitled to a jury that is not "uncommonly willing to condemn a [person] to die." *Witherspoon v. Illinois*, 391 U.S. 510, 521, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Based on this principle, the United States Supreme Court has held that potential jurors may not be excluded merely because they voice general moral or philosophical reservations about the death penalty. *Id.* at 522, 88 S.Ct. 1770; *see also Steele*, 961 A.2d at 803; *Commonwealth v. Uderra*, 580 Pa. 492, 862 A.2d 74, 81 (2004).

Pennsylvania Rule of Criminal Procedure 631(E) provides that in capital cases, a trial court must permit individual *voir dire* to be conducted, unless the defendant waives this right. We have held, in a case post-dating Appellant's trial and sentencing:

> Although a trial court may collectively ask a jury panel questions pertaining to preliminary matters such as inability to serve, knowledge of the case or of witnesses, acquaintance with law enforcement officers, and prior experiences as a victim or a relative of a victim of a crime, the trial court must give defense counsel the opportunity to thoroughly examine all potential jurors during individual *voir dire.*

*Commonwealth v. Boxley*, 575 Pa. 611, 838 A.2d 608, 613 (2003) (citing *Commonwealth v. Craver*, 547 Pa. 17, 688 A.2d 691, 697 (1997), and *Commonwealth v. DeHart*, 512 Pa. 235, 516 A.2d 656, 662 (1986)). Appellant's argument relies heavily upon Rule 631(E) and *Boxley*, and interprets our decision in *Boxley* as establishing that the deprivation of the right to individual *voir dire* constitutes *per se* prejudice, obviating a defendant's need to prove prejudice in the context of an ineffectiveness of counsel claim.

However, we have also held:

> The decision to disqualify a juror is within the discretion of the trial court, and will only be reversed for an abuse of discretion. A potential juror may be excluded if he holds views on capital punishment that prevents or substantially impairs that person from adhering to the trial court's in-

structions on the law. A juror's bias need not be proven with unmistakable clarity.

*Steele, supra* at 804 (citations and quotation marks omitted).

We first address Appellant's claim respecting the fifteen venire persons regarding whom trial counsel lodged no objection when stricken, and then Appellant's claim respecting the twelve venire persons regarding whom trial counsel lodged objections when dismissed without further *voir dire.* With respect to both groups of venire persons, Appellant has presented argument ignoring significant facts of record. Moreover, it is critical to recognize that attached to the written questionnaire given to all prospective jurors in this case was an affidavit that these individuals were required to sign whereby, under penalty of perjury, they attested that the answers given are true and correct to the best of their knowledge, information, and belief. *See* N.T. *Voir Dire,* 8/5/02, 11.

With respect to the fifteen venire persons who were stricken, based on answers to a written questionnaire, without trial counsel objection, the record establishes that Appellant's counsel **agreed** that these potential jurors should be stricken for reasons wholly unrelated to their answers regarding whether or not they could impose the death penalty. Appellant fails to incorporate this clearly significant fact into his argument. The record shows that based on answers to the court's written questionnaire, trial counsel determined that these fifteen individuals should not serve on Appellant's jury. Moreover, the record shows that trial counsel's basis for agreeing to the dismissal of these venire persons was, at the very least, eminently reasonable.[36]

36. The fifteen venire persons identified by Appellant in his Amended PCRA Petition, and the reasons articulated by Appellant's counsel for desiring or not opposing their dismissal are as follows:

(1) M.C. wrote on his questionnaire: "I don't think this thing should even be happening ... [b]een convicted twice, technicalities, the Superior Court is dragging this out." He also answered "no" to a question concerning whether he could respect the presumption of innocence. N.T. *Voir Dire,* 8/5/02, 24–25.

(2) T.S. was objected to by Appellant's trial counsel, in counsel's words, because "she has formed an opinion she can't set aside. On that basis[,] we don't object to a cause." N.T. *Voir Dire*, 8/8/02, 102.

(3) D.C. was objected to by Appellant's trial counsel because she had indicated having a problem with her hearing or sight. The trial court also noted that she had written a complaint on her questionnaire about "wasting people's money with all trials." *Id.* at 112–13.

(4) E.J. was objected to by Appellant's trial counsel, in counsel's words, because "she knows about the case or has read or heard about the case, he killed three people, and furthermore she knows prosecution witnesses . . . ." *Id.* at 102–3.

(5) M.A. gave on his questionnaire two conflicting opinions regarding his feeling about the death penalty, and further indicated that he has hearing problems and was to be admitted into the hospital during the anticipated time of the trial's occurrence. *Id.* at 114–15.

(6) J.V., who responded that he had been a victim of a crime, knew Appellant, and knew a witness, was objected to by Appellant's trial counsel, in counsel's words, because counsel "was concerned with him about his knowledge of the case." *Id.* at 117–18.

(7) W.S. was objected to by Appellant's trial counsel, in counsel's words, because "he formed an opinion about the guilt or innocence, and . . . he would not be able to set aside that opinion." *Id.* at 128.

(8) D.H. was a local dentist who indicated that one of his patients had been one of the murder victims. *Id.* at 131–32.

(9) M.D. indicated on her questionnaire that she had a problem with the testimony of convicts and that she had medical issues that would require frequent bathroom breaks. *Id.* at 132.

(10) D.R. was objected to by Appellant's trial counsel, in counsel's words, because "he formed an opinion on guilt. In particular[,] he's wondering why this is the third trial again." *Id.* at 136–37.

(11) P.M. wrote on his questionnaire that he would never follow the court's instructions and vote for a sentence of life imprisonment even if instructed pursuant to the law (although, paradoxically, he indicated that he would not impose a sentence of death either). He also indicated that he had a hardship regarding his need to care for his mother. *Id.* at 110–11.

(12) M.M. was objected to by Appellant's trial counsel because this venire person indicated that he would not vote for a sentence of life imprisonment under any circumstances and that he knows two of the prosecution's most significant witnesses. The record further indicates that the Commonwealth expressed an interest in further questioning of this venire person because he did not indicate any reluctance with imposing the death penalty, thus further undercutting Appellant's argument regarding the striking of this venire person. N.T. *Voir Dire*, 8/13/02, 93–94.

(13) M.S. was stricken by the trial court because she had vacation plans that fell within the anticipated dates for the trial. Because of her vacation plans, Appellant's counsel indicated that he had no objection to her being stricken for cause. *Id.* at 96–97.

(14) M.C. was 74 years old and answered "no" to a question concerning whether she could respect the presumption of innocence. Further, she failed to answer several significant questions, including whether she had formed an opinion as to guilt or innocence and those

Placed in the context of our standard of review, the record conclusively establishes that trial counsel had a reasonable strategy for either asking that these fifteen venire persons be dismissed or not opposing the dismissal of these fifteen venire persons. Because trial counsel had a reasonable strategy designed to benefit his client, counsel could not be determined to have rendered ineffective assistance. *Washington*, 927 A.2d at 594. Accordingly, appellate counsel was not ineffective for failing to raise a meritless claim.

■ Regarding the twelve venire persons who were stricken over trial counsel's objection, where trial counsel desired individual questioning, Appellant argues that these twelve individuals were stricken based on their answers to Question 30 of the questionnaire. Question 30, as represented by Appellant, read in full:

Which of the following best describes your opinion of the death penalty? (CHECK ONLY ONE). If none of the options listed reflects your opinion regarding the death penalty, please describe your personal view of the death penalty in the space provided.

_____ I would never vote to impose the death penalty in a criminal case, regardless of the evidence.

_____ My views of the death penalty are so strong that they would seriously affect my decision making as a juror and interfere with my duty to be fair and impartial.

_____ I would be able to impose the death penalty in a murder case if the evidence warranted it.

_____ I would always vote to impose the death penalty in a murder case, regardless of the evidence.

questions respecting the burden of proof and reasonable doubt. Appellant's counsel indicated that he had no objection to her being stricken for cause. *Id.* at 98.

(15) E.B. was objected to by Appellant's trial counsel, in counsel's words, because "he knows about the case ..., formed a fixed opinion regarding guilt[,] and ... indicates the defendant is guilty" and cannot set that opinion aside. *Id.* at 105–06.

_____ None of the above. A better description of my opinion concerning the death penalty is: _____

Appellant's Brief at 25–26.

Eleven of the twelve venire persons stricken over trial counsel's objection chose the first option, indicating that they would never vote to impose the death penalty in a criminal case, regardless of the evidence. The remaining individual selected the last option, and explained that he had a religious opposition to the death penalty. Appellant argues that excluding these venire persons based on their written answers to Question 30, without an opportunity to further explore their death penalty views by oral *voir dire* in order to establish whether they could follow the law despite their reservations about the death penalty, violated his rights as articulated by *Witherspoon* and its progeny and resulted in a jury that was "uncommonly willing to condemn a person to die."

Before addressing Appellant's specific arguments, we must note that Appellant completely neglects to mention that the record also establishes that except for one individual, these twelve venire persons also answered "no" to Question 33(a) ("If you find the defendant guilty of first degree murder and further find that the Commonwealth proved beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances, would you follow the law and the instructions of the judge and vote to impose the death penalty?"), or "no" to Questions 33(a) and "yes" to Question 33(c) ("As a juror, will you avoid finding the defendant guilty of first degree murder because you do not want to face the more difficult decision of life imprisonment or death sentence in the penalty phase of the case?"). The trial court specifically noted that it was dismissing the venire persons not simply because of their answers to Question 30, but also their answers to Question 33(a), and, in some cases, additional reasons.[37]

Question 33 read in full:

[37.] The twelve venire persons identified by Appellant for his argument and the reasons given by the trial court for striking for cause are as follows:

(1) M.G. checked the first answer to Question 30 (would never vote to impose the death penalty in a criminal case, regardless of the evidence) and checked "no" to Question 33(a). She also indicated that she would be on vacation during the anticipated dates of the trial and that she had formed an opinion on the case by stating: "I think Mr. Chmiel killed these people from what I've read and heard" and that she had read that Mr. Chmiel had befriended the victims, then robbed and stabbed them to death. Appellant's trial counsel wished to question her further on the basis that she might have confused Appellant with his brother Martin. The trial court struck the venire person for cause because of her answers to the death penalty questions and, it would appear without being clearly stated, because of her formed opinion of the case. N.T. *Voir Dire*, 8/5/02, 25–29.

(2) Fr. L., a Catholic priest, checked the first answer to Question 30 and further indicated on the questionnaire that his bishop would prefer that the bishop's priests not serve on juries. This is the one of the twelve venire persons at issue for whom the record does not establish a "no" answer to Question 33(a); however, an off-the-record discussion was held during the in-court discussion of this venire person. The court stated after the off-the-record discussion: "He's indicated, and I would expect a Catholic priest to answer that as much, he indicated that he could never vote to impose the death penalty, so we'll strike him for cause." *Id.* at 31.

(3) W.M. checked the first answer to Question 30 and checked "no" to Question 33(a). The trial court struck him for cause for his responses to these questions as well as his answer to another question where he stated that serving on a jury would cause him an unbearable hardship. *Id.* at 35–36.

(4) W.B.; (5) D.A.; (6) M.K.; and (7) A.C. all checked the first answer to Question 30 and checked "no" to Question 33(a). The trial court struck them for cause for their responses to these questions. Respectively, *id.* at 53–54; N.T. *Voir Dire*, 8/8/02, 99–101; N.T. *Voir Dire*, 8/13/02, 102–03; and *id.* at 104–05.

(8) B.T. checked the first answer to Question 30, checked "no" to Question 33(a), and checked "yes" to Question 33(c) (would avoid finding the defendant guilty of first degree murder to avoid the more difficult decision of life imprisonment or death sentence in the penalty phase of the case). The trial court struck her for cause for her responses to Questions 30 and 33(a), as well as her indication that she had a pre-paid vacation scheduled for the anticipated dates of the trial. N.T. *Voir Dire*, 8/8/02, 107–09.

(9) D.H. checked the first answer to Question 30, checked "no" to Question 33(a), and checked "yes" to Question 33(c). The trial court struck him for cause for his responses to these questions. N.T. *Voir Dire*, 8/13/02, 86.

(10) D.B. checked the first answer to Question 30, checked "no" to Question 33(a), and checked "yes" to Question 33(c). The trial court struck her for cause for her responses to these questions, and also because she indicated that she was aware of the previous trials and worked with Appellant's sister. *Id.* at 99–100.

(11) J.S. checked the last answer to Question 30 and stated that the death penalty was against his religious beliefs, checked "no" to Ques-

The case before you has the death penalty as a possible sentence.

There will be a trial to determine whether the Commonwealth has proven the defendant guilty of one or more of the crimes charged. During this part of the proceedings, it will be your job to determine whether the defendant is guilty or not guilty of the alleged offenses. If you find the defendant guilty of first-degree murder, there will be a penalty phase. You must then decide whether to sentence the defendant to death or life imprisonment.

If you find the defendant guilty of first degree murder, your sentence will depend upon your findings with respect to aggravating and mitigating circumstances. Aggravating circumstances are those matters which are defined by statute as making a first degree murder more terrible, whereas mitigating circumstances are statutory factors that make a first degree murder less terrible. The Commonwealth has the burden of proving an aggravating circumstance beyond a reasonable doubt while the defendant bears the burden of proving a mitigating circumstance by a fair preponderance of the evidence.

Your verdict must be a sentence of death only if you unanimously find at least one aggravating circumstance and no mitigating circumstances, or if you unanimously find one or more aggravating circumstances which outweigh any mitigating circumstances. On the other hand, if you find that no aggravating circumstances exist or that the aggravating circumstances do not outweigh the mitigating circumstances, then your sentence cannot be death but must be life imprisonment.

(a) If you find the defendant guilty of first degree murder and further find that the Commonwealth proved beyond a

tion 33(a), and checked "yes" to Question 33(c). The trial court struck him for cause for his responses to these three questions. *Id.* at 114–15.

(12) N.M. checked the first and second answers to Question 30 and checked "no" to Question 33(a). She further wrote on the questionnaire that she was not willing to be responsible for another person's death regardless of his or her actions. The trial court struck her for cause for her responses to these questions. *Id.* at 119–21.

reasonable doubt that the aggravating circumstances out-weigh the mitigating circumstances, would you follow the law and the instructions of the judge and vote to impose the death penalty?

_____ Yes _____ No

(b) If you find the defendant guilty of first degree mur-der, but further find that the Commonwealth did not prove beyond a reasonable doubt that there were any aggravating circumstances, or if you find mitigating circumstances by a fair preponderance of the evidence which outweigh any aggravating circumstances, would you follow the law and the instructions of the judge and vote for a sentence of life imprisonment?

_____ Yes _____ No

(c) As a juror, will you avoid finding the defendant guilty of first degree murder because you do not want to face the more difficult decision of life imprisonment or death sen-tence in the penalty phase of the case?

_____ Yes _____ No

PCRA Court Opinion at 45 n. 24.

■ As indicated earlier, a potential juror may be exclud-ed if he or she holds views on capital punishment that prevent or substantially impair that person from adhering to the trial court's instructions on the law. *See, e.g., Steele, supra* at 804. "It is well settled that a prospective juror may be excluded for cause when his views on capital punishment are such as would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Commonwealth v. Speight,* 578 Pa. 520, 854 A.2d 450, 459 (2004) (quoting *Commonwealth v. Holland,* 518 Pa. 405, 543 A.2d 1068, 1073 (1988)). "Further, we have held that a trial court is within its discretion to exclude jurors who expressed reservations about imposing the death penalty, and that **trial counsel has no constitutional obligation to attempt to change the jurors' views.**" *Steele, supra* at 804 (citing *Commonwealth v. Carson,* 590 Pa. 501, 913 A.2d 220, 262 (2006)) (emphasis added).

Indeed, the United States Supreme Court in *Witherspoon, supra,* made clear that its holding did not extend to potential jurors who would under no circumstances vote for the death penalty. The Court stated:

> We repeat ... that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.

*Witherspoon, supra* at 522 n. 21; 88 S.Ct. 1770.

Here, all but two of the twelve venire persons at issue indicated by written questionnaire, as to which they attested the truth of their answers under penalty of perjury, that they would (1) never vote to impose the death penalty in a criminal case, regardless of the evidence; and (2) not follow the law and the instructions of the judge and vote to impose the death penalty even if they found Appellant guilty of first-degree murder and found that the Commonwealth had proven beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances. One other venire person affirmatively wrote that he had religious scruples against the death penalty and attested that he would not follow the law and the instructions of the judge and vote to impose the death penalty even if he were to find Appellant guilty of first-degree murder and were to find that the Commonwealth had proven beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances. The final venire person, a Catholic priest, attested that he would never vote to impose the death penalty in a criminal case, regardless of the evidence.

Thus, the sworn views of these twelve venire persons disqualified them from serving on Appellant's jury pursuant to our case law. Trial counsel had no constitutional obligation to

attempt to change their views. *Steele, supra* at 804. More-
over, the disqualification of these few venire persons based on
their passionate views against the death penalty could not
form the basis for an argument that Appellant faced a jury
that was "uncommonly willing to condemn a person to die"
under the United States Supreme Court analysis in *Wither-
spoon.* Indeed, in *Commonwealth v. Harris,* 550 Pa. 92, 703
A.2d 441 (1997), and *Commonwealth v. Cox,* 556 Pa. 368, 728
A.2d 923 (1999), we addressed *voir dire* procedures nearly
identical to the present one, and observed: "As a trial judge
has wide latitude in supervising the manner in which *voir dire*
is conducted, including the power to prevent further *voir dire*
when response to death qualification questions prove that
additional inquiry will be fruitless, the trial court [does] not
err by dismissing the jurors." *Harris, supra* at 446 (citation
omitted). We further stated, "We reject appellant's argument
that trial counsel should have continued to question the ex-
cused jurors. . . . The trial court correctly removed jurors
when it found that their views on capital punishment would
'prevent or substantially impair' the performance of their
duties. . . . " *Cox, supra* at 930–31. Thus, there was no impro-
priety in the dismissal of these 12 venire persons here.[38]

**38.** Appellant argues that there is no direct mention in *Cox* that the trial
court had used a written questionnaire in order to ascertain the views
and experiences of the venire panel. Moreover, Appellant contends
that both *Harris* and *Cox* pre-dated *Boxley,* which Appellant argues has
modified the holdings of *Harris* and *Cox* without so stating. In re-
sponse, we observe first that, ·although *Cox* does not specifically state
that the trial court had used a written questionnaire, the opinion does
reproduce the long and detailed questions posed to the venire panel
regarding their views toward the death penalty. If these lengthy
questions were not written, as they probably were, but as they definitely
were in *Harris,* then that circumstance actually makes Appellant's
argument less persuasive. A written questionnaire would allow a
venire person a greater opportunity to reflect and consider his or her
views on a difficult issue.

Second, we observe that *Boxley* is readily distinguishable from the
instant case as well as from *Harris* and *Cox.* In *Boxley,* after the venire
panel was orally asked by the trial judge to respond to certain ques-
tions, the judge restricted the attorneys from asking the individual
venire persons questions regarding matters that the judge had previous-
ly posed to the panel. The judge then inconsistently enforced this
restriction, and in several instances prevented defense counsel from

We note further that the record establishes, and Appellant himself admits, that at least seventeen venire persons who gave answers on the written questionnaire that reflected their discomfort with imposing the death penalty were retained for individual questioning, including those who answered yes to Question 33(c).[39] Appellant's Brief at 24; Appellant's PCRA Petition at 49. Appellant further admits that of these individuals, two were seated on his jury and one was seated as an alternate juror, and only three were dismissed because of their fixed views against the death penalty. Appellant's PCRA Petition at 49 n. 11. Under all of the circumstances here present, we see no merit in Appellant's claim that he was denied a right to individual *voir dire* pursuant to Rule 631(E) or otherwise.

As there is no constitutional or legal merit to Appellant's claim regarding the twelve venire persons at issue, appellate counsel could not have been ineffective for failing to have raised an ineffectiveness claim against trial counsel, nor could appellate counsel be ineffective for failing to raise a substantive claim on direct appeal.

**9. Did the Commonwealth's presentation of inflammatory, prejudicial testimony from Assistant District Attorney Fisher[ ] violate Appellant's Eighth Amendment Right to a reliable capital sentencing proceeding[,] and were prior counsel ineffective for failing to raise and litigate this issue?**

■ Appellant made an argument on direct appeal that he had been unfairly prejudiced by the penalty phase testimony of Assistant District Attorney William Fisher ("ADA Fisher"). As described by this Court, that argument and the facts surrounding it are as follows:

Appellant asserts that the trial court erred in allowing the testimony of [ADA] William Fisher ... regarding Appel-

asking "life qualification" questions. We determined that these restrictions violated Pa.R.Crim.P. 631(E). *Commonwealth v. Boxley*, 575 Pa. 611, 838 A.2d 608, 613–14 (2003).

**39.** *See, e.g.,* N.T. *Voir Dire,* 8/13/02, 87, 103, and 107–08.

lant's prior rape conviction as such testimony was hearsay, inflammatory, and prejudicial. The Commonwealth sought the testimony of ADA Fisher, who prosecuted Appellant for rape, to support a finding of the aggravating circumstance that "the defendant has a significant history of felony convictions involving the use or threat of violence to the person." 42 Pa.C.S. § 9711(d)(9). Defense counsel filed a motion *in limine* to bar evidence of this prior conviction, including testimony by ADA Fisher. After reviewing the testimony provided by ADA Fisher at Appellant's 1995 murder trial, the trial court denied the motion *in limine.* Because the rape victim and her father, who had also testified at the 1995 trial, were deceased by the time of the 2002 trial, the trial court reasoned that the only evidence that could be presented by the Commonwealth with respect to the facts surrounding the rape conviction was ADA Fisher's testimony.

ADA Fisher testified that while the rape victim was driving home from work after midnight[,] Appellant forced her off the road into an embankment. Once the victim exited her vehicle, Appellant punched her in the face and disrobed her. After he was unable to vaginally or anally rape her, Appellant further beat the victim and directed her to perform oral sex on him. The victim protested that her teeth were loose from the beating, and Appellant forced her to pull her tooth out and perform oral sex on him. The victim complied. ADA Fisher testified that after the rape[,] Appellant forced the victim into her car, and told her he was going to retrieve his gun from his pick-up truck and that the last thing she would see was the bullet coming out of her head. As Appellant walked to his truck, the victim jumped out of her car and flagged down a passing motorist, who stopped to help her. N.T., 9/9/2002, at 26–28.

*Chmiel III,* 889 A.2d at 539.[40]

We rejected Appellant's argument on the following rationale:

**40.** Although ADA Fisher had prosecuted the rape case against Appellant while working for the Lackawanna District Attorney's Office, at the

A death sentence will only be reversed if the jury relied on an unsupported and, therefore, improper aggravating circumstance in rendering its penalty phase verdict. [*Commonwealth v.*] *Jones* [542 Pa. 464], 668 A.2d [491,] 519 [ (1995) ]; *Commonwealth v. Williams,* 537 Pa. 1, 640 A.2d 1251, 1263 (1994). Regardless of whether ADA Fisher's testimony was hearsay, inflammatory, or prejudicial, we find that Appellant is not entitled to relief on this claim because any error in that regard was clearly harmless. Despite ADA Fisher's testimony, the jury did not find as an aggravating circumstance that Appellant had a significant history of felony convictions involving the use or threat of violence. *See* 42 Pa.C.S. § 9711(d)(9). To the contrary, the jury found as a mitigating circumstance that Appellant had no significant history of prior criminal convictions. *See* 42 Pa.C.S. § 9711(e)(1) ("Mitigating circumstances shall include the following: (1) The defendant has no significant history of prior criminal convictions. . . ."). Therefore, Appellant cannot demonstrate that he was prejudiced by any alleged error relating to this testimony. *Commonwealth v. Christy,* 511 Pa. 490, 515 A.2d 832 (1986) (finding that the erroneous admission of evidence pursuant to 42 Pa.C.S. § 9711(d)(9) was not prejudicial because the jury did not find the aggravating factor); *Jones,* 668 A.2d at 520 ("Even if Trooper Ansel's summarization was hearsay, we find that its admission constitutes harmless error since the jury did not find the existence of this aggravating circumstance.").

*Id.* at 539–40.

Here, Appellant raises the same issue that he had raised on direct appeal, only via different avenues of attack. Although he acknowledges that his trial counsel and appellate counsel both objected to the penalty phase testimony of ADA Fisher, and argued at all appropriate times that the trial court erred by allowing the testimony of ADA Fisher, Appellant nonetheless now argues that his trial and appellate counsel were ineffective with respect to their advocacy. Appellant contends

time of his testimony at Appellant's murder trial, penalty phase, he was employed by the Philadelphia District Attorney's Office.

that had trial and appellate counsel rendered effective stewardship, they would have also argued that ADA Fisher's testimony constituted an Eighth Amendment violation, a generic due process violation, a violation against a prosecutor's improper vouching of witness testimony, and an improper injection of non-statutory aggravating circumstances into the jury's sentencing determination.

Appellant's argument is meritless for a host of reasons. First, the entire crux of Appellant's claim is based on his assertion that the testimony of ADA Fisher was inflammatory and unfairly prejudicial, a claim that we expressly rejected in *Chmiel III* as being unavailing to Appellant's request for a new penalty hearing. We specifically determined that there was no prejudice to Appellant arising from the testimony of ADA Fisher. Thus, Appellant's claim of being unfairly prejudiced by ADA Fisher's testimony has been previously litigated, prohibiting any PCRA relief. 42 Pa.C.S. § 9543(a)(3).

Second, although Appellant cites case law generally defining an Eighth Amendment violation as prohibiting a death sentence based on inaccurate sentencing information, Appellant's contentions that ADA Fisher's testimony was inaccurate in any meaningful manner, if at all, are not substantiated.[41] Appellant cites no case law that links testimony such as that provided by ADA Fisher with any Eighth Amendment or due process claim. As we determined in *Chmiel III*, the jury's verdict plainly evidences that it was not based on ADA Fisher's testimony.

Third, Appellant's claim that ADA Fisher engaged in improper vouching is wholly misplaced. "Improper bolstering or vouching for a government witness occurs where the prosecutor assures the jury that the witness is credible, and such assurance is based on either the prosecutor's personal knowledge or other information not contained in the record." *Commonwealth v. Cousar*, 593 Pa. 204, 928 A.2d 1025, 1041 (2007). Here, ADA Fisher **was** the witness, who was recounting the

---

**41.** Moreover, Appellant does not assert a layered ineffectiveness claim concerning whether trial counsel was deficient in his cross-examination of ADA Fisher.

facts and his experience of a prior successful prosecution against Appellant for rape. The district attorney eliciting ADA Fisher's testimony has not been accused by Appellant in his PCRA petition of having vouched for ADA Fisher's credibility.[42] Further, Appellant's culpability for the rape had already been determined by the jury in that case; thus, Appellant's present "vouching" argument regarding a finally determined criminal trial is an extraordinary reach. Moreover, the jury did not find ADA Fisher's testimony sufficient to support the aggravating circumstance that "the defendant has a significant history of felony convictions involving the use or threat of violence to the person." 42 Pa.C.S. § 9711(d)(9). On the contrary, the jury found as a mitigating circumstance that Appellant had no significant history of prior criminal convictions. *See* 42 Pa.C.S. § 9711(e)(1). Additionally, for the reasons just stated, Appellant's claim that ADA Fisher's testimony injected non-statutory aggravating circumstances into the jury's sentencing determination has no basis in the record.

In sum, Appellant's arguments are largely a rehash of those made on direct appeal, now clothed in "new," ill-fitting or inapt legal theories and disingenuously dressed up as claims of ineffectiveness of trial and appellate counsel. Because Appellant's claim has been previously litigated and for the additional reasons we mention, Appellant is not entitled to relief under the PCRA. *See* 42 Pa.C.S. § 9543(a)(3).

10. **Did the prosecutor's misconduct at the penalty phase violate Appellant's Sixth, Eighth, and Fourteenth Amendment rights and his rights under Article I, Sections 1, 6, 9, 13, 14[,] and 25 of the Pennsylvania Constitution?**

In this argument, Appellant alleges that the Commonwealth engaged in numerous instances of prosecutorial misconduct in its penalty phase closing to the jury. Appellant further

---

42. We do not hold that an argument concerning improper vouching may never be established as it concerns the trial testimony of a prosecutor; however, the specific limits of an improper vouching claim are well established. Appellant has failed to raise an argument falling within those limits.

asserts that trial counsel were ineffective for having failed to object to these instances of alleged misconduct and to object to their cumulative impact, and that appellate counsel were ineffective for failing to raise an argument concerning trial counsel's alleged deficiencies with respect to these assertions.[43]

A claim of ineffective assistance grounded in counsel's failure to object to a prosecutor's comments "may succeed when the petitioner demonstrates that the prosecutor's [comments] violated a constitutionally or statutorily protected right, such as the Fifth Amendment privilege against compulsory self-incrimination or the Sixth Amendment right to a fair trial, or a constitutional interest such as due process." *Commonwealth v. Cox*, 603 Pa. 223, 983 A.2d 666, 685 (2009) (quoting *Tedford*, 960 A.2d at 29). "To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." *Cox, supra* at 685 (quoting *Greer v. Miller*, 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987)). "The touchstone is the fairness of the trial, not the culpability of the prosecutor." *Id.*

A prosecutor may make fair comment on the admitted evidence and may provide fair rebuttal to defense arguments. *Id.* at 687. Even an otherwise improper comment may be appropriate if it is in fair response to defense counsel's remarks. *Id.* Any challenge to a prosecutor's comment must be evaluated in the context in which the comment was made. *Id.* During closing argument in the penalty phase, a prosecutor must be afforded reasonable latitude, and permitted to employ oratorical flair when arguing in favor of the death penalty. *Commonwealth v. Stokes*, 576 Pa. 299, 839 A.2d 226, 231–32 (2003). It is not improper for the prosecutor

43. Appellant acknowledges that during the prosecutor's closing argument, trial counsel did object to the Commonwealth's use of a photograph of Appellant's rape victim, resulting in the court giving a cautionary instruction to the jury; however, Appellant now complains that trial counsel should have based his objection on additional grounds not then raised.

to urge the jury to view the defense's mitigation evidence with disfavor and thus to impose the death penalty. *Id.* at 233.

Not every unwise, intemperate, or improper remark made by a prosecutor mandates the grant of a new trial:

Reversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict.

*Cox, supra* at 687 (citation omitted); *see also Carson,* 913 A.2d at 242.

We have further observed that "murder victims are not simply props or irrelevancies in a murder prosecution, and innocuous references to victims and their families are not necessarily prejudicial." *Paddy,* 15 A.3d at 459 (quoting *Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385, 415 (2003)).

 In the instant case, Appellant first argues that the prosecutor improperly argued to the sentencing jury matters that Appellant characterizes in this claim as "victim impact evidence arising from a non-capital crime." *See, e.g.,* Appellant's Brief at 54. Specifically, Appellant objects to the prosecutor's reference during closing to Appellant's rape victim and the circumstances concerning that crime. As previously mentioned, the Commonwealth introduced evidence regarding Appellant's conviction of this crime to establish the aggravating factor set forth at 42 Pa.C.S. § 9711(d)(9) ("the defendant has a significant history of felony convictions involving the use or threat of violence to the person"). The particularly violent and savage facts of the rape, including Appellant's threat to murder the rape victim, were recounted by this Court in *Chmiel III,* 889 A.2d at 539, and quoted in the immediately preceding issue herein.

Now, Appellant asserts that he was unfairly prejudiced by the prosecutor's reference in his closing to the facts of the rape; the prosecutor's description of Appellant, based on those facts, as "sick" and "depraved;" the prosecutor's ques-

tioning the jury as to the "weight" to be given to the experience of the rape victim; asking the jury to do what is right for the rape victim; and asking the jury to show Appellant the same mercy that he showed the rape victim and the Lunarios. Appellant's Brief at 55.

Wholly absent from Appellant's argument is any acknowledgment that the prosecutor's reference to the rape and its victim to the jury was made openly, directly, and plainly in connection with the Commonwealth's circumscribed argument that Appellant's past criminal history fell under the aggravating factor set forth at 42 Pa.C.S. § 9711(d)(9). *See* N.T. Trial, 9/9/02, at 122–23. The Commonwealth's recitation of the facts of the rape was based on evidence given at trial, and the Commonwealth is unquestionably permitted to argue to the jury that trial evidence establishes one of the statutory aggravating factors. *See* 42 Pa.C.S. § 9711(a)(2) and (3). The prosecutor's reference to the "weight" to be given to the experience of the rape victim is nothing more than a request to the jury to provide the appropriate weight to the aggravating factor that the Commonwealth was seeking to prove. N.T. Trial, 9/9/02, at 122. Appellant's transmogrification of the Commonwealth's permissible argument regarding the aggravating factor set forth at 42 Pa.C.S. § 9711(d)(9) as "victim impact evidence arising from a non-capital crime" is baseless and ignores the record. Unsurprisingly, Appellant cites no authority supporting his novel theory.

Moreover, as the PCRA court astutely observed, Appellant has failed to show prejudice, particularly in light of the fact that the jury did not find the aggravating factor set forth at 42 Pa.C.S. § 9711(d)(9). PCRA Court Opinion at 65. Additionally, this Court has consistently held that it is permissible for the Commonwealth to ask the jury to show the defendant the same mercy that he or she had shown the murder victim or victims. *See, e.g., Freeman, supra* at 415–16. It cannot be seriously maintained that here, where the prosecutor could ask the jury to show Appellant the same mercy that he had shown his three elderly murder victims, that the prosecutor's inclusion of the rape victim in this request resulted in an

unfair prejudice "such that the jurors could not weigh the evidence and render a true verdict." *Cox, supra* at 687.

Next, Appellant argues that the prosecutor inflamed the jury's passions by making the following closing remarks, which we expand beyond the excerpted version set forth by Appellant in his brief:

> Was it for money? Think about the weight. Did he have to kill those old people, sick, defenseless old people some? Did he have to kill them? Did he have to stab them 10, 11, 12 times? What weight do you give that? He needed money. He couldn't steal a car? He couldn't stick up a convenience store? He had to go in and butcher three old people? What weight is added by that? Or did he kill because he enjoyed killing?

> When I was getting ready for this case and before we came up here I was reading a book and, obviously, I was well into this case by that point in time, and I read something in a book that was quoting another book that I thought this is so appropriate I've got to write it down. And what I wrote and what I read was: Thus speaks the judge. Why did this criminal murder? He wanted to rob, but I say unto you he so wanted blood, not robbery. He thirsted after the bliss of the knife. When you think what weight to give that aggravating circumstance, think. If he wanted money, why, why did he have to kill three people?

N.T. Trial, 9/9/02, at 120–21 (also quoted by this Court in *Chmiel III*, 889 A.2d at 538).[44]

Appellant contends that there was no trial evidence that Appellant "thirsted after the bliss of the knife." However, in his brief, Appellant excerpted that portion of the text of the prosecutor's closing concerning the reference to trial testimony that the elderly victims each had been stabbed ten or more times. Although no witness stated that Appellant "thirsted after the bliss of the knife," there is certainly trial evidence,

44. Appellant asserts that the prosecutor was quoting Nietzsche's "Thus Spoke Zarathustra." Appellant's Brief at 56 n. 15.

that Appellant is well aware of, that supports the prosecutor's characterization of Appellant's crimes.

Appellant also asserts that by quoting a literary "judge," the prosecutor "cloaked the argument in the authority of the judiciary," thus "relieving the jury of its fact-finding duty." Appellant's Brief at 56. Such "boilerplate allegations and bald assertions of . . . prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective" for failing to object, particularly where such allegations are, as here, patently absurd. *Paddy*, 15 A.3d at 443.

Moreover, we specifically determined that this **exact** language articulated by the prosecutor **in this** case was within the bounds of proper argument:

> Viewed in the context of the entire argument, these comments were "nothing more than oratorical flair; the prosecutor summarized the evidence of Appellant's criminal acts and argued, from that evidence, that the jury should impose a death sentence."

*Chmiel III*, 889 A.2d at 538 (quoting *Williams*, 863 A.2d at 522).

We made this determination in connection with a direct appeal argument brought by Appellant pursuant to *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). However, as can be readily discerned from the language of our determination, our view of the propriety of the prosecutor's remarks stands independently of any *Simmons* analysis. *Chmiel III, supra* at 535–39. Nothing Appellant now argues, by re-dressing this portion of his *Simmons* argument as alleged prosecutorial misconduct in support of an ineffectiveness claim, has altered our opinion. Thus, Appellant's argument also fails for having been previously litigated. 42 Pa.C.S. § 9543(a)(3).

Next, Appellant contends that the prosecutor's comments during closing prevented the jury from considering whether to grant him mercy. Appellant focuses on two excerpts of the closing remarks. First, Appellant revisits the prosecutor's request that the jury show the same mercy to

Appellant as he showed to the rape and murder victims. Appellant then emphasizes the following comments, which were made subsequent to the prosecutor's request:

He deserves no mercy because he shows no mercy. It's that simple, ladies and gentlemen. The evidence, the law, you put them together. There's no way out. There is no other choice. And that is why I'm standing up here[.] I'm asking you to do what's right, do what's right.

N.T. Trial, 9/9/02, at 125–26.

 Appellant contends that the prosecutor "mischaracterized" the law and directed the jury to focus on prejudice and vengeance, as a matter of law. Appellant's Brief at 57. This argument is itself a mischaracterization of the prosecutor's argument. First, Appellant ignores, as he does throughout his entire prosecutorial misconduct claim, the fact that the court had properly instructed the jury on the relevant law and the jury's duty and obligations under that law, and that they were expressly cautioned against being influenced by passion or prejudice. *See* PCRA Court Opinion at 63. Further, the prosecutor himself correctly repeated the law and jury's obligations in his summation and asked the jury to enforce the law. N.T. Trial, 9/9/02, at 115, 117–18. "The law presumes that the jury will follow the instructions of the court." *Spotz V,* 896 A.2d at 1224 (citation omitted); *see also Commonwealth v. O'Hannon,* 557 Pa. 256, 732 A.2d 1193, 1196 (1999) ("Absent evidence to the contrary, the jury is presumed to have followed the trial court's instructions."). There is no evidence proffered by Appellant, and none discernable in the record, to suggest that the jury did not follow the trial court's detailed and clear instructions. Indeed, the record plainly establishes that the jury followed the court's instructions when it found both aggravating and **mitigating** circumstances and when it **rejected** one of the aggravating circumstances urged by the Commonwealth.

 Second, as we observed in our review of the prosecutor's closing statement in *Chmiel III:* "There is nothing improper in the prosecutor arguing the appropriateness of the

death penalty because that is the only issue before the jury at the penalty phase of the trial." *Id.*, 889 A.2d at 538 (quoting *Commonwealth v. Stokes*, 576 Pa. 299, 839 A.2d 226, 233 (2003)). The prosecutor was not by his words instructing the jury with an incorrect version of the law. Rather, it is evident that the prosecutor was remarking that the trial evidence supported the aggravating factors in support of the death penalty, thereby outweighing considerations of mercy.

■ Similarly, Appellant's contention that the prosecutor's reference to the lack of "weight" of Appellant's proffered mitigating circumstances was not a mischaracterization of the law. The prosecutor equated Appellant's mitigating circumstances to an "excuse." N.T. Trial, 9/9/02, at 124. Without citation to any authority directly supporting his claim, Appellant asserts that referring to mitigating circumstances as an excuse violated his Eighth and Fourteenth Amendment rights. Again, our reading of the prosecutor's relevant comments shows that the prosecutor was not advancing a new jury instruction, but placing the concept of mitigation within the context of the evidence, wherein Appellant's own expert witness admitted that Appellant had no excuse for murdering the Lunarios. The prosecutor was urging the jury to reject Appellant's request for finding statutory mitigating circumstances.

■ A prosecutor may rebut mitigation evidence in his arguments and may urge the jury to view such evidence with disfavor. *Spotz VI, supra* at 291–92; *see also Commonwealth v. Rollins*, 558 Pa. 532, 738 A.2d 435, 449–50 (1999) (concluding that it was permissible for the prosecutor to disparage the mitigation evidence proffered by the appellant and to imply that it was of so little weight that it should not affect the verdict). Appellant's allegation that the prosecutor diminished the jury's sense of responsibility in the penalty phase is meritless, as it does not reflect any fair or reasonable interpretation of the prosecutor's own words. Thus, we conclude that Appellant's claim of improper denigration of the weight to be afforded his mitigation evidence is meritless.

██ Next, Appellant argues that the prosecutor improperly argued that a sentence of death was mandated by law. Similar in respects to some of the foregoing misconduct arguments, this argument asserts that the prosecutor improperly argued that (1) the evidence demonstrates that under the law the jury has "no choice" but to impose the death penalty; (2) the rights of the Commonwealth should be considered by the jury; and (3) the death penalty was written for people like Appellant, whose murderous acts show that he is unworthy of life in accordance with the statute. Appellant's Brief at 58–59.

The PCRA court determined that such argument was not beyond the bounds of permissible oratory, citing *Rios,* 920 A.2d at 820–21. As the PCRA court observed, in *Rios,* we reviewed and rejected an argument similar to that now raised by Appellant:

Appellant next claims that the prosecutor misstated the law in arguing that the legislature has decided that "there are some murders that just cannot be tolerated; that are more terrible than just what some people call an average murder, and they have enacted laws after careful consideration that certain killings require or sometimes demand that the penalty of death be imposed." This statement was improper, he reasons, in that it leads the jury to believe that the death penalty is mandatory for certain crimes.

This argument is specious. The prosecutor at no point indicated that certain types of murder carry by law a mandatory sentence of death. Further, the statute itself states that "the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstances or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances." 42 Pa.C.S. § 9711(c)(iv). As such, there are certain circumstances in which, because of the balance of aggravating and mitigating circumstances, the death penalty is required by Pennsylvania law. This does not run afoul of constitutional safeguards in that the jury itself has the discretion to determine in the first instance wheth-

er such aggravators and mitigators are present. Thus, counsel was not ineffective in failing to object to this portion of the prosecutor's closing argument.

*Rios, supra* at 820–21.

Appellant argues that *Rios* is "somewhat inapposite," claiming the difference between *Rios* and his case is that in his case, the prosecutor "rhetorically and literally" pointed to Appellant when stating that the death penalty was written for people like him. Appellant's Brief at 63. If there is, indeed, a difference that makes *Rios* "somewhat inapposite," it is not a significant one; in fact, we agree with the PCRA court that *Rios* supports that court's conclusion. Once again, the prosecutor's comments cited by Appellant are simply permissible argument regarding the appropriateness of the death penalty (*Chmiel III, supra* at 538); the prosecutor was not articulating an improper legal standard to the jury; and Appellant has failed to show that the jury did not follow the trial court's detailed and clear instructions.

 Finally, Appellant contends that he is entitled to relief due to the cumulative effect of the foregoing instances of alleged prosecutorial misconduct. It is settled, however, that "no number of failed claims may collectively attain merit if they could not do so individually." *Freeman,* 827 A.2d at 416 (quoting *Bracey,* 795 A.2d at 948). Because Appellant has failed to demonstrate that any of his claims of prosecutorial misconduct warrant relief individually, he cannot show that they do so when considered collectively.

In the instant case, Appellant has failed to show that any of the prosecutor's comments unfairly prejudiced the jury or indeed qualify as misconduct. Appellant has taken most of the challenged comments out of context, has misinterpreted their meaning, and/or has failed to consider directly relevant decisional law from this Court. Because there is no merit to the underlying claim of prosecutorial misconduct, none of Appellant's layered claims of ineffective assistance of counsel for failing to object to prosecutorial statements has any merit.

11. **Was trial counsel ineffective for failing to present Robert Chmiel as a mitigation witness[,] failing to request that counsel be appointed to represent him regarding the perjury threat, and failing to inform the Court that a threat was having a chilling effect upon the witness?**

In this claim, Appellant alleges that if not for a contemporaneous threat by the Commonwealth to file perjury charges against Appellant's brother, Robert Chmiel, Appellant's trial counsel would have called Robert to testify at the penalty hearing to corroborate and bolster the evidence already given regarding Appellant's dysfunctional childhood and the family's horrific relationship with the father. In the guise of a layered ineffectiveness claim, Appellant asserts that trial counsel was ineffective for not calling Robert to testify at the penalty hearing and for not seeking certain relief from the trial court regarding the "chilling effect that the threat was having on" Robert. Appellant's Brief at 81.

The "threat" to which Appellant refers was a statement made by the prosecutor to both Appellant's trial counsel and the trial judge at a sidebar conference during the penalty phase. These individuals were discussing the witnesses that Appellant still desired to call for testimony. Appellant's counsel mentioned that one of those witnesses was Robert Chmiel. At the mention of this potential witness, the prosecutor stated: "By the way, tell him a perjury warrant is coming for him[,] and I'm very serious. He's getting locked up for perjury because I'm sick and tired of that lying weasel." N.T. Trial, 9/9/02, at 79. The trial judge then immediately stated to Appellant's counsel, with mention of Appellant's other proposed witnesses: "So it would be Pickard, Gilhooley, and Bobby Chmiel. Then are you finished?" *Id.* No other discussion of the potential perjury charge against Robert was set forth in the trial record.

As the PCRA court later determined, the prosecutor's comments must be viewed in the context of Robert's testimony recently given during the guilt phase of trial. The court

summarized Robert's problematic testimony in the following manner:

The defense argued throughout the trial that [Appellant's] brother, Martin Chmiel, and brother-in-law, Thomas Buffton, had actually killed the Lunarios. During his direct examination, Robert Chmiel stated that he and Martin Chmiel had discussed their planned robbery of the Lunarios several months before the murders. Robert Chmiel claimed that when he inquired "what would happen if these people were in the house" at the time of the robbery, Martin Chmiel "told him to pretend it was a war zone and do what he had to do." Robert Chmiel further alleged that "he told Martin Chmiel to get out of his house after he talked about pretending being in a war zone."

On cross-examination, Robert Chmiel begrudgingly acknowledged that he had never mentioned his "story about the war zone" during his multiple interviews by the Pennsylvania State Police, the Lackawanna County District Attorney's office and the Attorney General's agents from 1983 through 2002, nor did he reference the alleged "war zone" remark when he testified six times at earlier trials and hearings. After Mr. Chmiel also denied under oath that [Appellant] had informed him shortly before the Lunario murders that he needed "fast money" to pay a lawyer, the prosecutor impeached him with his previous statements and testimony in which he affirmatively represented that [Appellant] had in fact made this statement. In response, Robert Chmiel attested under oath that he *never said anything about fast money to the state police* in Dunmore or anywhere else." However, when asked in the very next question what the phrase "fast money" meant to him, he contradicted his prior statement and replied, "I will tell you *the same thing that I told the state police up in Dunmore* and it was either stolen, crooked or it just wasn't yours."

More significantly, Robert Chmiel was confronted with his prior sworn testimony in which he unequivocally stated:

Q. Did [Appellant] ever come to you and ask you where he can get money?

A. Yes.

Q. Did he ask where he could get fast money?

A. Yes.

Mr. Chmiel's credibility was further impugned by his earlier sworn testimony in which he admitted that he would lie under oath for [Appellant] "if I really had to," and that he had in fact lied to the state police during their investigation. Based upon Robert Chmiel's guilt phase testimony which directly contradicted his earlier sworn testimony, together with his admitted willingness to lie on behalf of [Appellant], the prosecutor was not without an evidentiary basis for considering charges against Robert Chmiel for false testimony.

PCRA Court Opinion at 36–38 (citations to the record omitted; emphasis in the original).

Based on the PCRA hearing testimony of Appellant's two trial attorneys, Appellant now argues that said attorneys had an interest in calling Robert to testify at the penalty phase, but after being informed of the prosecutor's remarks, Robert did not testify. According to Robert's PCRA hearing testimony, he was nonetheless still willing to testify, but the attorneys decided that they would not call him as a witness. N.T. PCRA Hearing, 8/11/08, at 207. Attorney Ackourey's PCRA hearing testimony did not indicate how it was specifically determined that Robert would not testify. N.T. PCRA Hearing, 8/12/08, at 93–98. Attorney Grealish recalled at the PCRA hearing that he had conveyed to Robert a threat from the prosecutor that if he testified at the penalty phase, he could be prosecuted for perjury. However, Attorney Grealish did not identify which person made the decision that Robert would not testify. N.T. PCRA Hearing, 12/16/08, at 112–14.

Appellant contends that the fruit of the prosecutor's threat was that he was deprived of his right to present Robert's mitigating evidence concerning Appellant's character, record, and the circumstances of his offense, as guaranteed by 42 Pa.C.S. § 9711(e)(8) and due process guarantees under the Pennsylvania and United States Constitutions. Appellant's Brief at 82–83. Accordingly, Appellant contends that trial counsel lacked any reasonable basis for not making appropri-

ate motions to the trial court in order to secure Robert's testimony, that he was prejudiced thereby, and that his appellate counsel were ineffective for having failed to purse relevant arguments on direct appeal.

Although the PCRA court articulated no credibility determinations specifically referring to the PCRA hearing testimony of Robert or Appellant's two trial attorneys, the PCRA court did determine that Appellant "has not demonstrated that the prosecutor's off-handed perjury remark so intimidated and distressed Robert Chmiel as to compel him to refuse to testify." PCRA Court Opinion at 38. The court further determined that the "PCRA testimony presented reflects that Attorney Ackourey opted not to call Robert Chmiel as a witness, not that Mr. Chmiel refused to do so for fear of prosecution." *Id.* at 38–39. In sum, the PCRA court concluded that Appellant had failed to show the necessary nexus between the prosecutor's threat and the fact that Robert did not testify. *Id.* at 39.

Moreover, the PCRA court concluded that Appellant's trial attorneys had a "legitimate reason" for not presenting Robert's mitigation testimony. *Id.* That reason was grounded in Robert's contradictory and obviously unhelpful guilt phase testimony. Thus, any mitigation evidence from Robert, in the PCRA court's view, "would have diluted or detracted from the impact of Felix Chmiel's far more articulate and compelling testimony during the third trial. As such, mitigation testimony from Robert Chmiel would not have positively affected the sentencing outcome for [Appellant]." *Id.* Additionally, the court concluded that Appellant had failed to show a reasonable probability that Robert's mitigating evidence would have contributed to a different penalty being imposed by the jury. *Id.*

Addressing the PCRA court's latter point first, under Issue 7 herein, we concluded that Robert's PCRA testimony raised no new claims of abuse, aside from claiming to have seen his sister, Theresa, sobbing while tied to a chair, and that his testimony was essentially cumulative of that given by Felix and Dr. Ouligian at the penalty phase of trial. Indeed, we also observed that Appellant even appears to have conceded that

Robert's potential mitigating testimony was essentially cumulative. *See* Appellant's Brief at 20. Again, trial counsel is not ineffective for having failed to present mitigating evidence that would have been merely cumulative of evidence that was presented during a penalty hearing. *Miller*, 987 A.2d at 667; *Spotz V*, 896 A.2d at 1231, 1232.

However, we must also note that, despite whatever message was conveyed to Robert by Appellant's trial counsel, nothing in the record supports the proposition that the Commonwealth had actually threatened to prosecute Robert if he testified at the penalty phase. Rather, the prosecutor's threat on record was that Robert was, in all events and in that moment, facing a perjury charge for past behavior, undoubtedly because of his guilt phase testimony. We do not condone the prosecution engaging in any manner of behavior that could be construed as witness intimidation; indeed, we condemn such behavior. However, had Robert testified at the penalty phase hearing and conformed his sworn testimony to the truth, he would not have been subject to any perjury charges stemming from **that** testimony. Quite simply, Robert was not constrained from truthfully testifying at the penalty hearing. On the other hand, if Robert could not have been relied upon to tell the truth at the penalty phase, then Appellant's counsel "may not be found to be ineffective because [they] failed to facilitate a defense based upon lies." *Commonwealth v. Bolden*, 562 Pa. 94, 753 A.2d 793, 798 (2000).

Accordingly, for several reasons, including those based on the factual determinations of the PCRA court, Appellant's argument lacks merit, as there is no basis to the underlying claim. Accordingly, neither trial counsel nor appellate counsel may be deemed to have been ineffective.

### COMBINED GUILT AND PENALTY PHASE CLAIM

12. **Is Appellant entitled to relief from his convictions and death sentence as a result of the cumulative impact of the errors described herein?**

Appellant's final issue is an assertion that the cumulative effect of the alleged errors raised in the prior ten substan-

tive issues merits relief. In his main brief, Appellant makes no particularized, specific, or reasoned argument for prejudice related to cumulative error. His entire argument consists of three sentences, with citation to two United States Supreme Court cases, generally asserting a right to relief grounded in an alleged denial of his rights under the 5th, 6th, 8th, and 14th Amendments. Such a vague, generalized, undeveloped claim is not reviewable. *See Commonwealth v. Small,* 602 Pa. 425, 980 A.2d 549, 579 (2009) (concluding that a broad and vague claim of the prejudicial effect of cumulative errors did not entitle the appellant to relief).

In his reply brief, Appellant takes a second, more specific approach, quoting *Commonwealth v. Johnson,* 600 Pa. 329, 966 A.2d 523, 532 (2009), wherein this Court held that cumulative prejudice from multiple instances of deficient performance may properly be assessed in the aggregate when the individual claims have failed due to lack of prejudice. *Johnson,* in turn, cited *Commonwealth v. Perry,* 537 Pa. 385, 644 A.2d 705, 709 (1994), for the principle that a new trial may be awarded due to cumulative prejudice accrued through multiple instances of trial counsel's ineffective representation concerning a failure to adequately investigate and prepare for trial. Appellant then points generally to those claims where he has asserted counsel ineffectiveness because of trial counsel's failure to adequately investigate and prepare for trial: Issues 3, 4, 5, 6, and 7.

In none of those particular claims did we rule that Appellant's assertions had any arguable underlying merit. Thus, because none of the claims met the first, arguable merit prong of the *Pierce* test for ineffective assistance of trial counsel, that circumstance obviated the need to conduct a lack of prejudice inquiry. Indeed, in none of these claims did we conclude that trial counsel had failed to adequately prepare for the relevant task. To the extent that we did incorporate a lack of prejudice component in our disposition of these claims, which was at best a minimal aspect of our analysis, we discern the absence of any furrow deep enough to allow a "cumulating" impact of prejudice to flow in establishing a right to a

new trial or penalty hearing. *See Lesko,* 15 A.3d at 416–17. Appellant's final argument is, as are the several that Appellant relies upon for this claim, wholly without merit.

Having reviewed all of Appellant's issues, and having concluded that all lack merit, we affirm the order of the PCRA court denying Appellant's petition. Indeed, Appellant's arguments, which have attempted to place a spotlight on alleged ineffectiveness of trial and appellate counsel, have only showed that Appellant had the significant benefit of highly competent, careful, forceful, and aggressive advocacy at both the guilt and penalty phases of his third trial.

 With regard to this last point, we note, with regret and disfavor, that Appellant's present counsel have chosen to raise several issues that are plainly frivolous and/or are based on excerpted portions of the relevant record, where the full record immediately reveals a far different perspective. A frivolous issue is one lacking in **any** basis in law or fact, but is distinguishable from an issue that simply lacks merit. *Amaker v. Pennsylvania Bd. of Probation and Parole,* 525 Pa. 100, 576 A.2d 50, 51 (1990); *Smith v. Pennsylvania Bd. of Probation and Parole,* 524 Pa. 500, 574 A.2d 558, 562 (1990).

For brevity, we single out Appellant's counsel's arguments in Issues 8 and 9. In Issue 8, regarding trial and appellate counsel's alleged ineffectiveness with regard to the striking of 27 venire persons, current counsel presented argument without disclosing a full and candid factual background, which, once considered, made plain that the ineffectiveness claim against trial counsel was unmistakably frivolous for at the very least fifteen of these venire persons. In Issue 9, regarding alleged inflammatory testimony and improper "vouching" brought forth by the prosecution to prove an aggravating factor **that the jury did not find,** current counsel asserted a re-dressed, previously litigated and rejected claim. However, counsel's present argument plainly lacks a basis in law, largely ignores "the elephant in the room" that the jury **rejected** the prosecutor's attempt to prove the aggravator, and baldly

asserts, without any form of substantiation, that Appellant has been prejudiced.

We strongly admonish counsel that "[a] lawyer ... has no duty, indeed no right, to pester a court with frivolous arguments, which is to say arguments that cannot conceivably persuade the court...." *Smith, supra* at 563 (quoting *McCoy v. Court of Appeals*, 486 U.S. 429, 436, 108 S.Ct. 1895, 100 L.Ed.2d 440 (1988)). Additionally, we remind counsel of an admonishment made by this Court in a previous PCRA capital appeal:

> In view of the multitude of specious arguments, previously litigated issues, and assertions contradicted by the facts of record in this appeal, we deem it necessary to remind Appellant's PCRA counsel that there exists a duty not to pursue baseless claims or frivolous issues. *See* Rule 3.1 the Rules of Professional Conduct; *cf.* Rule 2744 of the Rules of Appellate Procedure (appellate court may award reasonable counsel fees and delay damages if it determines that an appeal is frivolous); *Smith* [, *supra* ] (appellate court had the power to assess attorney's fees against court-appointed counsel who had filed a frivolous appeal). It is apparent that prior counsel was mindful of this duty in choosing not to appeal every adverse ruling or decision.

*Commonwealth v. DeHart*, 539 Pa. 5, 650 A.2d 38, 47 n. 10 (1994).

PCRA capital counsel do their clients no service by inventing specious reasons to attack stratagems of trial and appellate counsel that were reasonably made and pursued, and the waste of public resources caused by counsel's pursuit of specious arguments will not be tolerated. The gravity of a capital case does not relieve counsel of their obligation under Rule 3.1 of the Rules of Professional Conduct not to raise frivolous claims. *See Commonwealth v. Morales*, 549 Pa. 400, 701 A.2d 516, 527 n. 28 (1997).[45] We warn counsel that

45. We note that Rule 3.1, as further explained in its Explanatory Comments, relaxes in criminal cases the requirement of raising only meritorious contentions so that the defense may require the prosecution to prove every element of the crime even where there is no non-

appropriate measures will be recommended when counsel has violated or ignored its obligations under our Rules of Professional Conduct.[46]

Chief Justice CASTILLE, Justices EAKIN, BAER, TODD and ORIE MELVIN join the opinion.

Justice SAYLOR concurs in the result.

frivolous basis for a defense. Such is not the case in the examples mentioned above, nor does this Rule relax the requirement that an attorney in a criminal appeal present the full factual background and legal bases of an issue with candor.

46. In view of our disposition, the Commonwealth's Application for Judicial Notice or, in the Alternative, for Remand to Supplement the Record is denied as moot. The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).